Adrian Dewayne **GREEN**, Appellant

v.

The **STATE** of Texas, Appellee.

No. 14–06–00154–CR.

Court of Appeals of Texas, Houston (14th Dist.).

July 24, 2007.

Rehearing Overruled Sept. 13, 2007.

A. Yes.

Michael A. McEnrue, Houston, TX, for appellants.

Donald W. Rogers, Jr., Houston, TX, for appellees.

Panel consists of Chief Justice HEDGES and Justices FOWLER and EDELMAN.

## MAJORITY OPINION

WANDA McKEE FOWLER, Justice.

Appellant Adrian Dewayne Green was convicted by a jury of murder and his punishment assessed at fifty years' con-

finement in the Texas Department of Criminal Justice, Institutional Division, and a $10,000 fine. On appeal, appellant complains of errors in the court's charge and its instructions to the jury. Because we find reversible error in the jury charge, we reverse and remand for a new trial.

## I. Factual and Procedural Background

Appellant and his younger brother, Jermarxian Deandre Green, were each charged by indictment with the murder of Quinton Kelegon, the complainant. The two were tried together as co-defendants before the same jury. The jury found appellant guilty of murder and found Jermarxian guilty of manslaughter.[1]

### A. The Evidence Presented at Trial

Some time before 2:00 a.m. on March 13, 2005, Kelegon and three friends, Desonyeigh Dwayne Hooper, Lebroderick Williams, and Christopher Pope, decided to go to Carrington's, a nightclub located in a strip mall on South Main inside Loop 610. They arrived near closing time in Hooper's vehicle, a 1990 Chevrolet Caprice Classic, and parked in the parking lot Carrington's shares with other businesses. The group did not go inside Carrington's, but instead walked around the parking lot socializing and looking at girls.

Also parked in the same parking lot was an orange or tangerine colored, customized Ford Expedition owned by appellant.[2] Appellant, a local rapper, and his younger brother, Jermarxian Deandre Green, were

promoting appellant's music CDs from the Expedition.

Eventually, as people began leaving the club, Kelegon and his friends decided to leave the parking lot. Hooper was driving the Caprice and Kelegon sat in the front passenger seat. Williams and Pope were seated in the back, with Pope behind Hooper and Williams behind Kelegon.

At this point, the facts developed at trial by the State's witnesses Hooper, Williams, and Pope differ in various details and diverge significantly from those of the defense. The State's witnesses testified generally that after they left the club's parking lot they stopped at a red light at South Main and Westridge. At that time, they were playing music in the Caprice from a CD entitled "Tha Boss," by rapper Slim Thug. Thug's music talked "about rappers" and some of it included "very unflattering" and "negative" references to appellant's rap music.

Appellant, driving the Expedition, with his brother Jermarxian as passenger, pulled up on the passenger side of the Caprice. According to the State's witnesses, appellant could hear the music and became angry, and he and Kelegon, in the front passenger seat of the Caprice, exchanged words. Appellant appeared "riled up," and "very angry" toward Kelegon and Hooper, the driver. Pope testified that appellant said to Kelegon, "Do you know me?" and Kelegon responded with "No, I don't know you. Do you know me?," which they repeated back and forth several times.[3] When Kelegon saw appellant dis-

---

1. Jermarxian Deandre Green was indicted in Cause No. 1033352, in the 185th District Court of Harris County. Upon finding Jermarxian guilty of manslaughter, the jury assessed his punishment at eighteen years' confinement in the Texas Department of Criminal Justice, Institutional Division. This Court considered his appeal in Cause No. 14–06–00155–CR.

2. The Expedition was described as having Lamborghini-style doors that opened upward and spinning rims, among other things.

3. Hooper testified that appellant said to Kelegon, "Do y'all got a problem with me?," to which Kelegon responded, "Man, I don't even know you" and "Who are you?"

playing an unloaded semiautomatic pistol, he told Hooper that appellant had a gun and said, "[L]et's go. Dude got a pistol, he show it on the steering wheel, let's go." At the next red light, the Expedition pulled up next to the group on the driver's side of the Caprice, and Hooper saw Jermarxian Green in the passenger seat "bent down low" and "looking like he was loading a pistol." Hooper ran the red light, and he heard a shot fired. Hooper, Williams, and Pope all testified that no firearms were in or fired from the Caprice.[4]

Hooper drove onto the 610 freeway heading north. The Expedition followed, pulled up alongside the passenger side of the Caprice, and several shots were fired at the Caprice. A bullet grazed Kelegon's leg, and he exclaimed, "My leg is burning; it's shot. This dude shot me." Then, as the two cars sped along the freeway, the Expedition pulled up toward the driver's side of the Caprice, and more shots were fired. One of the bullets shattered the driver's side rear door window of the Caprice and hit Kelegon in the side of the head. Hooper exited the 610 Loop at Evergreen, and drove Kelegon to a hospital, where Kelegon later died.

The hospital contacted the Houston Police Department, and Officer A.G. Riddle of the Homicide division and several others investigated the incident. Riddle examined the Caprice and determined that there were seven fresh gunshot strikes in the vehicle, including four to the passenger side and three to the driver's side of the vehicle. He also determined that all of the shots were fired at angles from the rear of the vehicle toward the front. Riddle found no evidence indicating a firearm had been fired from inside the Caprice. The police attempted to locate, but never found, the Expedition.

An autopsy was performed on Kelegon's body by Dr. Morna Gonsoulin, an assistant medical examiner with the Harris County Medical Examiner's Office. Gonsoulin determined that the cause of Kelegon's death was a gunshot wound to the head. The bullet entered behind and slightly above the left ear, and exited on the right side of the temple. The bullet traveled from left to right, slightly back to front, and slightly downward.[5] She also found a superficial abrasion on Kelegon's right leg. Gonsoulin testified that Kelegon was pronounced dead at 1:30 p.m. on March 13, 2005.

Herbert Thompson, Jr., a friend of Jermarxian Green who was called by the State, testified that he saw Jermarxian some time after the incident and spoke to him about it. Thompson testified that Jermarxian told him that he and appellant had been to Carrington's that night and that they were in the Expedition when the shooting occurred. Thompson could not remember whether the reason Jermarxian gave for the incident was that he and his brother were being robbed or whether it was that they were being carjacked. Thompson testified that Jermarxian believed he had fired the fatal shot, and appeared remorseful.

---

4. When the police examined the Caprice, they found a box containing several .25 caliber bullets in the glove compartment. Also found was a gun case, and inside the case was a clip containing 9 millimeter bullets, which Hooper testified was locked and in the trunk of his car along with other possessions because he had recently moved. In addition, the police found a lockbox containing a box of ammunition for a .22 caliber rifle.

5. Darrell Stein, a firearms examiner, compared the bullet obtained from Kelegon's head to the six bullet fragments recovered from the Caprice by Officer Riddle. Although he could not determine with certainty that they were all fired from the same gun, all had sufficient characteristics to enable him to testify that they could have been fired from the same type of firearm, which would have included the 9 millimeter semiautomatic pistol.

Appellant did not testify at trial, but Jermarxian testified in his defense. Jermarxian's version of events differed significantly from those of the other witnesses to the incident, particularly concerning who were the aggressors. Jermarxian was with appellant, his older brother, on March 13, 2005, to help appellant promote his CD. Appellant was a local celebrity and owned the Expedition. Appellant drove the Expedition that night.

When Jermarxian and appellant got to the traffic light at South Main and Westridge, the Caprice pulled up to the driver's side of the Expedition and Kelegon twice said to appellant, "Do you know me?," and appellant responded, "I don't know you." Kelegon then said, "Well, you know what time it is," but appellant did not say anything in response. As they were still waiting at the light, Kelegon then got out of the Caprice, and Jermarxian saw that Kelegon had a gun. Jermarxian interpreted Kelegon's statements and actions to mean that the occupants of the Caprice were attempting to carjack them. Appellant then sped towards the 610 Freeway, but the Caprice caught up to the Expedition. Appellant told Jermarxian to hand appellant his gun, which appellant said was in the console of the Expedition. Jermarxian handed the gun to appellant, who told Jermarxian to get down.

As the Caprice pulled up to the Expedition, appellant began shooting. Then, as the Caprice came around to the passenger side of the Expedition, Jermarxian told appellant to give him the gun. Jermarxian shot twice at the Caprice, not aiming at anyone or intending to kill anyone, but just "to get those guys off of us." He saw one of the bullets shatter the back driver's side rear window. Jermarxian believed that this shot killed Kelegon.

Jermarxian admitted that four people rode in the Caprice because he could see them. He acknowledged that firing a loaded weapon at a car full of people was an act clearly dangerous to human life. Although Jermarxian acknowledged that seven bullet holes were found in the Caprice, he claimed he had done nothing wrong because Kelegon and the others were trying to rob him and he was trying to protect himself. He agreed that the forensic testimony showed the bullets traveled from the rear of the Caprice toward the front, but he would not agree that he and appellant were behind the Caprice when the shots were fired into it. Instead, he claimed he shot twice when the Caprice pulled alongside the Expedition and was dead even with it. After the incident, he inspected the Expedition and found no bullet holes.

## B. The Court's Charge at the Guilt–Innocence Stage

Appellant's complaints only concern the charge. As a result, we will review it in detail.

The indictment in relevant part alleged in separate paragraphs that appellant (1) intentionally and knowingly caused the complainant's death by shooting him with a deadly weapon, namely a firearm, and (2) intended to cause serious bodily injury to the complainant and caused his death by intentionally and knowingly committing an act clearly dangerous to human life by shooting him with a deadly weapon, namely a firearm. *See* TEX. PENAL CODE §§ 19.02(b)(1) & 19.02(b)(2). The trial court conducted a charge conference at the conclusion of the evidence at the guilt-innocence stage of the trial. Appellant's trial counsel objected to the charge only on the basis that it did not include the offense of manslaughter as a lesser-included offense of murder. The trial court agreed to include this instruction in the charge.

As finalized, the charge included several standard definitions and instructions to the jury, including the following instructions on the law of parties:

All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

These instructions are consistent with the language of sections 7.01(a)(1) and 7.02(a)(2) of the Penal Code addressing parties to an offense.

However, in the application paragraphs, which immediately followed the above instructions on the law of parties, the trial court submitted the offense of murder to the jury as follows:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 13th day of March, 2005, in Harris County, Texas, the defendant, Adrian Dewayne Green, did then and there unlawfully, intentionally or knowingly cause the death of Quinton Kelegon, by shooting Quinton Kelegon with a deadly weapon, namely, a firearm; or if you find from the evidence beyond a reasonable doubt that on or about the 13th day of March, 2005, in Harris County, Texas, Jermarxian Deandre Green, did then and there unlawfully, intentionally or knowingly cause the death of Quinton Kelegon, by shooting Quinton Kelegon with a deadly weapon, namely, a firearm; or

If you find from the evidence beyond a reasonable doubt that on or about the 13th day of March, 2005, in Harris County, Texas, the defendant, Adrian Dewayne Green, did then and there unlawfully intend to cause serious bodily injury to Quinton Kelegon, and did cause the death of Quinton Kelegon by intentionally or knowingly committing an act clearly dangerous to human life, namely by shooting Quinton Kelegon with a deadly weapon, namely, a firearm; or if you find from the evidence beyond a reasonable doubt that on or about the 13th day of march 2005, in Harris County, Texas, Jermarxian Deandre Green, did then and there unlawfully intend to cause serious bodily injury to Quinton Kelegon, and did cause the death of Quinton Kelegon by intentionally or knowingly committing an act clearly dangerous to human life, namely by shooting Quinton Kelegon with a deadly weapon, namely, a firearm, and that the defendant, Adrian Dewayne Green, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Jermarxian Deandre Green to commit the offense, if he did, then you will find the defendant guilty of murder, as charged in the indictment.

Following these application paragraphs, the charge provided the following:

You are further instructed that before a person can be guilty of murder he must have intentionally or knowingly caused the death, or he must have intended to cause serious bodily injury and have intentionally or knowingly committed an act clearly dangerous to human life that caused the death of the deceased. Unless you find beyond a reasonable doubt that the defendant is

guilty of murder, or if you have a reasonable doubt thereof, you will acquit the defendant of murder and next consider whether the defendant is guilty of manslaughter.

The jury was also charged on manslaughter, both as a principal and as a party, and on self-defense. The jury returned a general verdict finding appellant guilty of murder.

## II. Analysis of Appellant's Issues

### A. Appellant's Issues

Appellant does not challenge the legal or factual sufficiency of the evidence supporting his conviction; all of his issues are directed to the trial court's charge as submitted to the jury. As briefed, appellant contends the trial court reversibly erred by (1) submitting the question of his criminal liability for murder as a principal on insufficient evidence; (2) allowing the jury to convict him for the murder committed by his brother, Jermarxian Deandre Green; (3) failing to instruct the jury that it must agree on the specific criminal conduct appellant committed that justified a guilty verdict of murder; and (4) failing to instruct the jury that it must agree on the predicate offense of Jermarxian Green that justified finding appellant a party to his crime.

### B. Standard of Review

■ In reviewing jury charge error, we undertake a two-step process. *See Hutch v. State*, 922 S.W.2d 166, 170–71 (Tex. Crim.App.1996). First, we must determine whether error exists in the charge. *See id.* at 171. Second, we review the record to determine whether sufficient harm was caused by the error to require reversal of the conviction. *See id.*

■ The degree of harm necessary for reversal depends on whether the error was preserved. *Id.* An error properly preserved by an objection must be reversed unless it is harmless. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984). However, when the charging error is not preserved, reversal is not required unless the harm is egregious. *Id.*

■ In determining whether error is egregious, we consider the following factors: (1) the entirety of the jury charge; (2) the state of the evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *See Sanchez v. State*, 209 S.W.3d 117, 121 (Tex.Crim.App.2006); *Almanza*, 686 S.W.2d at 171. Errors which result in egregious harm are those which affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defense theory. *Sanchez*, 209 S.W.3d at 121; *Almanza*, 686 S.W.2d at 172. In other words, the error must have been so harmful that the defendant was effectively denied a fair and impartial trial. *See Almanza*, 686 S.W.2d at 172. Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *See Hutch*, 922 S.W.2d at 171.

### C. The Trial Court Reversibly Erred by Instructing the Jury that It Could Convict Appellant of Murder If It Found that Appellant's Brother Committed Murder.

■ We begin with appellant's second issue because that issue disposes of the appeal. In his second issue, appellant contends the trial court reversibly erred by instructing the jury that it could find *appellant* guilty of murder if it found beyond a reasonable doubt that *"Jermarxian Deandre Green* [ ] did then and there unlawfully, intentionally or knowingly cause the death of Quenton Kelgon with a deadly weapon, namely a firearm." (emphasis added) Appellant contends that this language, lacking the party language that usually

accompanies this type of instruction, charged the jury that it could convict appellant of murder if it found that his brother committed murder. Among other things, appellant contends this portion of the charge allowed him to be convicted for conduct that is not an offense and without requiring the jury to find the elements of party responsibility. We agree. We also find that the error caused appellant egregious harm.

### 1. The Charge Error

 The charge as submitted authorized the jury to convict appellant of murder if it found beyond a reasonable doubt that

- Adrian Dewayne Green, did then and there unlawfully, intentionally or knowingly cause the death of Quinton Kelegon, by shooting Quinton Kelegon with a deadly weapon, namely, a firearm; or

- *Jermarxian Deandre Green, did then and there unlawfully, intentionally or knowingly cause the death of Quinton Kelegon, by shooting Quinton Kelegon with a deadly weapon, namely, a firearm; or*

- Adrian Dewayne Green, did then and there unlawfully intend to cause serious bodily injury to Quinton Kelegon, and did cause the death of Quinton Kelegon by intentionally or knowingly committing an act clearly dangerous to human life, namely by shooting Quinton Kelegon with a deadly weapon, namely, a firearm; or

- Jermarxian Deandre Green, did then and there unlawfully intend to cause

serious bodily injury to Quinton Kelegon, and did cause the death of Quinton Kelegon by intentionally or knowingly committing an act clearly dangerous to human life, namely by shooting Quinton Kelegon with a deadly weapon, namely, a firearm, and that the defendant, Adrian Dewayne Green, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Jermarxian Deandre Green to commit the offense.

The instruction italicized above was intended to offer the jury the option of convicting appellant of murder as a party, but the party language was omitted from that particular instruction (although it was included in the serious bodily injury instruction). Consequently, the jury was not instructed that, to find appellant guilty as a party to the murder Jermarxian committed, it had to find that appellant "with the intent to promote or assist" in the commission of the offense, "solicited, encouraged, directed, aided or attempted to aid" Jermarxian in committing murder. *See* Tex. Penal Code 7.02(a)(2).[6] Thus, as the charge was presented, appellant could be found guilty of murder based solely on his brother's conduct. Because the charge is the instrument by which the jury convicts, the charge must contain an accurate statement of the law and must set out all the essential elements of the offense. *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex.Crim. App.1995). A jury charge is fundamentally defective if it omits an essential element of the offense or authorizes conviction on a

---

**6.** Properly stated, that part of the charge should have authorized the jury that it could find appellant guilty of murder if it found beyond a reasonable doubt that "Jermarxian Deandre Green, did then and there unlawfully, intentionally or knowingly cause the death of Quinton Kelegon, by shooting Quinton Kelegon with a deadly weapon, namely, a firearm, and that the defendant, Adrian Dewayne Green, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Jermarxian Deandre Green to commit the offense."

set of facts that do not constitute an offense. *Zuckerman v. State*, 591 S.W.2d 495, 496 (Tex.Crim.App.1979).

This case is like *Zuckerman v. State*, in which separately-indicted codefendants were tried together for the offense of burglary of a habitation. *See id.* at 496. The charge authorized the jury to convict the appellant for burglary if it found that his co-defendant was the guilty party, without a finding that the appellant was guilty as a party to the offense. *Id.* As the Court explained:

> It is essential to a conviction for any offense that the accused be criminally responsible either because it is committed by his own conduct or by the conduct of another for whom he is criminally responsible.... In this case the jury was authorized to convict appellant on a finding that his co-defendant committed the offense, without a finding that appellant personally committed the offense, or that he was criminally responsible for the acts of his co-defendant. It thus authorized conviction on a set of facts that would not constitute an offense for which he was criminally responsible. As such, the jury charge is fundamentally defective.

*Id.* Similarly, the jury here was authorized to convict appellant of a murder committed by someone else without a finding that he was guilty as a party to the offense. That was error. *See id.*

The State concedes only that the charge "could have been better worded," and argues that when read as a whole the charge "conveys the message" that the jury must apply the law of parties before it would be authorized to convict appellant for the offense of murder as a party to Jermarxian Green's conduct. For this proposition, the State relies on *Reyes v. State*, 741 S.W.2d 414 (Tex.Crim.App.1987).

However, *Reyes* is distinguishable. There, the defendant contended the trial court erred in refusing to include a requested charge applying the law of parties to the facts of the case. *Id.* at 423–24. Although the application paragraph of the court's charge did not include a parties instruction, the charge did include, at the defendant's request, an abstract instruction on the law of parties that also applied the law to the facts of the case. *Id.* at 423. Based on this, the Court of Criminal Appeals held that, when read as a whole, the trial court's instructions "encompass[ed] the substance" of the defendant's request and was therefore sufficient to charge the jury on the law of parties and apply the law to the facts. *Id.* at 424.

This charge does not do that. This charge contains an abstract instruction on the law of parties, but does not contain any instruction applying this law to Jermarxian's conduct in the complained-of paragraph. Thus, unlike the *Reyes* jury, this jury was given no guidance whatsoever concerning how it should apply the law of parties to Jermarxian's conduct. This was error. But before we can reverse, we must determine if the error caused appellant egregious harm requiring reversal and remand for a new trial.[7]

---

7. In the federal system, when a general verdict is entered after the jury was presented with one valid legal theory and one invalid and it is impossible to tell which ground the jury selected, the case would ordinarily be reversed without further inquiry. *See Griffin v. United States*, 502 U.S. 46, 52, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991); *United States v. Tomblin*, 46 F.3d 1369, 1385 (5th Cir.1995).

Our set of facts is slightly different in that we have several valid legal theories and only one invalid theory, but we have found no case stating that this would make a difference. Regardless, although a federal court would reverse on this set of facts, in Texas, our inquiry must continue so that we can fully apply *Almanza* to determine if the error resulted in egregious harm. *See Guevara v.*

## 2. Egregious Harm Review

To determine egregious harm, *Almanza* and its progeny instruct that we may consider not only the erroneous portion of the charge, but also other relevant aspects of the trial. *See Sanchez*, 209 S.W.3d at 121; *Hutch*, 922 S.W.2d at 171; *Almanza*, 686 S.W.2d at 171. As noted above, these relevant aspects include: (1) the entirety of the charge itself; (2) the state of the evidence including contested issues and the weight of the probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *See Sanchez*, 209 S.W.3d at 121.

### a. *The Charge*

We first consider the entirety of the jury charge. *See Sanchez*, 209 S.W.3d at 121. Absent evidence to the contrary, we must presume that the jury understood and followed the court's charge. *See Hutch*, 922 S.W.2d at 172. The jury was instructed that "[y]ou are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony, *but the law you shall receive* in *these written instructions, and you must be governed thereby*." (emphasis added) In short, the jury was expressly instructed to follow the law as presented in the charge.

The jury was abstractly charged on the law of parties, meaning that the charge generally instructed the jury that a person can be criminally responsible for the actions of another if the person solicits, encourages, directs, aids, or attempts to aid another in committing an offense. But, of utmost importance here, the application paragraph—the paragraph that authorizes the jury to accept or reject a specifically alleged offense—for murder as a party omitted the party language. Taken together, these instructions were inadequate,

for, between the abstract instruction and the application paragraph on murder as a party, neither specifically explained to the jury which facts it could properly consider to convict appellant as a party. In fact, the instructions were worse than that because, rather than merely withholding information from the jury, the application paragraph affirmatively misled the jury by telling the jury it could convict appellant for a murder committed by Jermarxian Green-even if appellant was not a party to the murder. This was a legally incorrect instruction that completely misstated the law, and to worsen matters, we cannot tell if the jury convicted appellant as a party based on the legally incorrect instruction or as a principal. *See id.* at 171–73; *Guevara v. State*, 191 S.W.3d 203, 207 (Tex. App.-San Antonio 2005, pet. ref'd) (holding that instructing the jury on a legal duty theory when appellant had no legal duty to prevent the commission of the offense was error); *see also Campbell v. State*, 910 S.W.2d 475, 477 (Tex.Crim.App.1995) (stating it is error for a trial judge to refer to the law of parties in the abstract portion of the jury charge and not to apply that law or to refer to that law in the application paragraph of the charge). We cannot assume the jury realized that the parties language was erroneously omitted, inserted appropriate language, and then applied it correctly.

### b. *The Evidence*

Next, we consider the evidence, including the contested issues and the weight of the probative evidence. *See Sanchez*, 209 S.W.3d at 121. The State offered the accounts of Kelegon's companions, Hooper, Williams, and Pope, to demonstrate that the group of young men were out for a night of socializing by going to the parking lot of a nightclub to hang out and look at

*State*, 152 S.W.3d 45, 52–53 (Tex.Crim.App. 2004).

girls. Appellant and his brother happened to be promoting appellant's rap CDs in the same parking lot, and as the group was leaving in their Caprice, appellant heard rap music coming from the car that referred to appellant's rap music in a derogatory way. Appellant then became angry and confrontational, and when he presented a gun, the group tried to speed away as appellant and his brother chased them in appellant's Expedition. The evidence showed that the Caprice sustained numerous bullet holes, while there was no evidence that anyone in the Caprice had a weapon or fired it at appellant and his brother.

In contrast to the State's account of the incident, appellant's brother Jermarxian testified he saw Kelegon get out of the car with a gun, and, based on Kelegon's threatening statements and conduct, he believed the group was attempting to carjack the Expedition. According to Jermarxian, he and appellant tried to drive away from the Caprice, but the Caprice chased the Expedition and eventually pulled up next to it. He admitted that both he and appellant fired appellant's gun at the Caprice, but he testified that he was shooting at the Caprice only to "get them off" of them. He also testified that he believed he fired the shot that killed Kelegon.

Thus, the contested issues included whether appellant or Jermarxian fired the fatal shot and whether the conduct was intentional or knowing, or merely reckless. The jury could have believed that Jermarxian murdered Kelegon and that appellant was a party to Jermarxian's conduct. Conversely, the jury could have believed that appellant fired the fatal shot and Jermarxian was a party to appellant's conduct. Alternatively, if the jury believed Jermarxian's testimony and disbelieved the State's witnesses, it could have determined that appellant and his brother acted only in self-defense. Thus, the parties fully joined the contested issue of appellant's guilt as either a primary actor or as a party to murder.

The State argues that any error in charging on the law of parties was "necessarily" harmless because the evidence "clearly supported a finding that appellant was responsible for the complainant's murder as a primary actor." *See Cathey v. State*, 992 S.W.2d 460, 466 (Tex.Crim.App. 1999) ("Even where proper objection is made at trial, we have held that where, as in the instant case, the evidence clearly supports a defendant's guilt as the primary actor, error in charging on the law of parties was harmless."); *see also West v. State*, Nos. 03–05–00206–CR, 03–05–00207–CR & 03–05–00208–CR, 2006 WL 2449856, at *10 (Tex.App.-Austin Aug.25, 2006, pet. ref'd); *Evans v. State*, No. 14–98–0705–CR, 2000 WL 854859, at *2 (Tex. App.-Houston [14th Dist.] June 29, 2000, pet. ref'd). However, none of these cases involved a situation, as we have here, in which an application paragraph authorized the defendant's conviction based on the conduct of the co-defendant. And, in any event, whether appellant or his brother were guilty of murder was disputed, and appellant's brother, Jermarxian, was convicted of a lesser offense even though he testified that he believed he fired the shot that killed the complainant. Therefore, we do not consider these cases dispositive of the question whether egregious harm was shown.

### c. *The Jury Arguments*

Finally, we consider the arguments of counsel. *See Sanchez*, 209 S.W.3d at 121. At closing, Mr. Leitner, Jermarxian's defense counsel, spoke first. He began by emphasizing the jury's duty to apply the law to the evidence. Among other things, he stated that "[t]he Court's Charge is the

law" and that it is "based on exactly what the statutes say and the Judge has set those forth in the charge." He then went through the charge, explaining the various paragraphs, but he did not mention the erroneous paragraph specifically. Counsel then discussed the perceived inconsistencies in the State's witnesses' testimony, and urged the jury to consider Jermarxian Green's testimony.

Appellant's defense counsel, Mr. Barr, then made his closing statement. Like Mr. Leitner, Mr. Barr also urged the jury to consider the perceived inconsistencies and weaknesses in the State's witnesses' testimony, Jermarxian's testimony, and the law of self-defense. He also questioned the evidence concerning the positions of the vehicles and the trajectory of the bullets, and argued that the bullets fired from the Expedition could have gone into the Caprice "from various angles." Although it is unclear from the context, this argument could have been directed either to whether it was appellant or Jermarxian who fired the shot that killed Kelegon, or whether the Expedition was chasing the Caprice or the Caprice was chasing the Expedition. Finally, Mr. Barr urged that the evidence did not support a finding of guilt.

The prosecutor, Ms. Bennett, spoke last. She discussed the evidence presented by the State's witnesses. Significant to our analysis, she then argued that "[appellant] was only able to hit [Kelegon] in the leg and the medical examiner confirmed that." Continuing, she stated, "Jermarxian hit the jackpot. He fired the gun through the back window and he killed [Kelegon]." Later, when discussing the physical evidence, Ms. Bennett stated,

> Then there's the shot that Jermarxian took, the one that killed [Kelegon], fired through the back window, that went directly through the passenger compart-

ment and struck the victim in the head. Dr. Gonsoulin confirmed that's the angle it had taken.

\* \* \*

They are both equally guilty. Jermarxian may have fired the killing bullet, but [appellant] here certainly did his part. He chased them down. He tried to kill them, tried to shoot them, tried to commit serious bodily injury. He just wasn't as good a shot as his brother. He can only hit him in the leg.

Thus, during her closing argument, the prosecutor urged that the evidence supported a finding that Jermarxian was guilty of murder for firing the fatal shot and that appellant was equally guilty because he gave Jermarxian the chance to shoot and kill. The charge for its part did not clarify the prosecutor's comments for the jury and, instead, misled the jury into believing it could find appellant guilty of murder if Jermarxian committed the murder.

### 3. The Error Resulted in Egregious Harm

██ The jury found appellant guilty of murder and found Jermarxian, who testified he believed he fired the fatal bullet, guilty of manslaughter. Although the jury's verdict may indicate that the jury believed that appellant, rather than Jermarxian, was guilty as a primary actor and that Jermarxian was merely reckless, we cannot know whether the jury found appellant guilty of murder based on an erroneous legal theory. But we do know one important fact: the jury was told in the application paragraph in the charge that it could convict appellant on an invalid legal theory. We cannot tell from the verdict or record whether or not the jury convicted on that basis, which would be error, but we can tell that neither the rest of the charge, nor the evidence, nor the jury arguments

set the record right and that the jury was affirmatively told it must follow the law given to it in the charge. These points factor heavily in our analysis and tip the scales toward egregious harm.

One might argue that the jury could not have relied on the improper jury charge to find appellant guilty of murder because the jury did not find Jermarxian guilty of murder. However, as a reviewing court, we cannot adopt this argument.

A jury may render logically inconsistent verdicts as to different co-defendants, and "it is not our duty to unravel the ratiocinations of the jury's collective logic." *See Odom v. United States*, 377 F.2d 853, 857 (5th Cir.1967) (and cases cited therein); *see also Ruiz v. State*, 641 S.W.2d 364, 366 (Tex.App.-Corpus Christi 1982, no pet) ("[C]onsistency is not necessary in criminal verdicts where the verdicts are returned in a joint trial of two or more indictments."). Moreover, the trial court's charge included the following instruction to the jury: "Your sole duty at this time is to determine the guilt or innocence of the defendant under the indictment in this cause and restrict your deliberations solely to the issue of guilt or innocence of the defendant." As a result of this instruction, we cannot speculate that the jury considered and applied the law consistently to both co-defendants. "[A]n individualized assessment of the reason for the inconsistency would be based on either pure speculation, or would require inquiries into the jury's deliberations that courts generally do not undertake." *United States v. Powell*, 469 U.S. 57, 66, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). Although much of this body of law is federal, we have found no state case law that contradicts it. *See Jackson v. State*, 3 S.W.3d 58, 61–62 (Tex. App.-Dallas 1999, no pet.); *Moranza v.*

*State*, 913 S.W.2d 718, 724 (Tex.App.-Waco 1995, pet.ref'd); *Ruiz*, 641 S.W.2d at 366.

Appellant's charge incorporates the idea set forth in the above case law that we review the viability of a verdict as it relates to an individual defendant, not as it relates to the group of defendants, requiring harmony among the defendants' verdicts. The court instructed the jury to consider the two charges before it—one for Adrian and one for Jermarxian—separately, thereby requiring the jury to focus first on one of the brothers' individual guilt or innocence and then on the other's guilt or innocence. While looking at a particular charge, the jury was required to consider the merits of that charge alone, and none other.

As the federal case law cited above reflects, juries frequently treat co-defendants differently, and that appears to have happened here. Focusing on Adrian only, as ordered by the court, the jury apparently believed Adrian was highly culpable, finding him guilty of murder as a principal or as a result of the improper party charge. But, when the jury considered Jermarxian's charge, the jury apparently decided to be more lenient or believed that Jermarxian was less culpable—possibly believing that Adrian started the fatal events in motion and was primarily responsible for the death that ultimately transpired—and chose to find Jermarxian guilty only of manslaughter.[8]

Thus, having been told to review each charge separately, but not having been told to harmonize its findings, the jury was not to consider any potential inconsistency in its verdicts. Because of this, we cannot say that the jury did not rely on the improper party offense to find Appellant guilty of murder based on an improper party offense. As we have already noted,

8. We do not know in what order the jury considered the two charges.

such "an individualized assessment of the reason for the inconsistency would be based on either pure speculation, or would require inquiries into the jury's deliberations that courts generally do not undertake." *Powell,* 469 U.S. at 66, 105 S.Ct. 471. We can do neither.

For these reasons, looking only to appellant's charge without considering Jermarxian's charge or verdict, we hold that the charge error affected the very basis of the case and deprived appellant of a valuable right; it authorized the jury to convict him of a murder committed by someone else without requiring the jury to find the elements of party responsibility beyond a reasonable doubt; this is not an offense under the laws of our state. This error was so harmful that appellant was effectively denied a fair and impartial trial. *See Sanchez,* 209 S.W.3d at 121 (holding charge error, which authorized jury to convict without finding every requisite element of the offense beyond a reasonable doubt, was egregious based on the entirety of the charge, the contested evidence, and the arguments of counsel); *Hammock v. State,* 211 S.W.3d 874, 879 (Tex.App.-Texarkana 2006, no pet.) (concluding egregious harm shown when some of alternative theories in charge permitted conviction for conduct not defined as an offense); *Guevara,* 191 S.W.3d at 210 (holding egregious harm resulted from erroneous jury instruction authorizing conviction based on legally inadequate theory).[9] We therefore sustain appellant's second issue.

9. The dissent acknowledges that the jury charge was erroneous, but posits that no egregious harm resulted because the evidence was sufficient to convict appellant on a correctly instructed alternative theory of culpability. However, courts have distinguished between a charge that correctly states the law but erroneously charges on a theory of guilt unsupported by the evidence and a charge that contains a misleading statement about the law—as we have here. The courts have rejected using the same analysis in the two situations. *See, e.g., Hammock,* 211 S.W.3d at 879 (distinguishing charge error in which several alternative theories were not offenses under the law as one that "presents a situation that has ramifications far beyond the typical possibility that a person was convicted of committing an offense one way instead of another way" and finding reversible error); *Guevara,* 191 S.W.3d at 206–07 (refusing to presume evidence was sufficient to support guilty verdict under alternative theory when charge included legally invalid theory); *see also Payne v. State,* 194 S.W.3d 689, 696 n. 2 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd) (acknowledging distinction between alleged misstatement of the law and alleged error in charging the jury on a theory of guilt not raised by the evidence and noting appeal before it was one involving sufficiency of the evidence). The reason for this distinction is that

> [J]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law-whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.

*Guevara,* 191 S.W.3d at 208 (quoting *Griffin v. United States,* 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)). Additionally, the dissent contends that language in the charge instructing the jury on the requisite mental state a person must have before being found guilty of murder effectively cured the charge error so that the jury would know not to find appellant guilty of murder based solely on Jermarxian's conduct. However, the language the dissent points to is not included in the paragraphs applying the law to the facts, and so it does not instruct the jury on what facts it must find to convict appellant under a correct statement of the law. Moreover, the language merely restates the intent required of a principal actor, which under the erroneous instruction would have been Jermarxian rather than appellant, and so it does not cure the erroneous omission of the parties instruction in the application paragraph. We cannot assume that the jury would have deduced and applied the law correctly based on this separate instruction.

### III. Conclusion

In summary, the jury was given four legal theories by which it could convict appellant of murder and one of those theories was invalid. We cannot tell which ground the jury relied on to convict appellant of murder. Nothing in the charge or trial corrected the misdirection the jury was given, and it resulted in egregious harm. Consequently, we reverse the trial court's judgment and remand for a new trial.

EDELMAN, J. Dissenting.

RICHARD H. EDELMAN, Justice, dissenting.

I agree with the majority opinion's finding of jury charge error in this case, but disagree with its finding of egregious harm [1] from that error.

An important factor affecting the harmfulness of error in a jury charge is the likelihood that the jury's verdict was actually based upon an alternative available theory of culpability on which the jury was correctly instructed and the evidence is sufficient to prove guilt. *See Medina v.* *State*, 7 S.W.3d 633, 640 (Tex.Crim.App. 1999).

In this case, the jury concluded under the evidence that a murder had taken place. The only two possible perpetrators of the murder were appellant and his co-defendant (and brother), Jermarxian. However, the jury found appellant to be the more culpable of the two by finding him guilty of murder, but finding Jermarxian guilty of only manslaughter.[2] In addition, the jury necessarily concluded under the charge that neither defendant was acting in self-defense and that it had no reasonable doubt whether either was doing so (otherwise, it would have been bound to acquit either or both).

The majority's conclusion that, "as the charge was presented, appellant could be found guilty of murder based solely on his brother's conduct" is not correct. Although the initial application paragraphs in appellant's charge on murder contained language supporting that conclusion, the final such paragraph qualified those preceding paragraphs by stating:

*You are further instructed that before a person can be guilty of murder, he must have intentionally or knowingly caused*

---

1. Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defense theory. *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex.Crim.App.2007). To determine whether jury charge error is egregious, the reviewing court should consider: (1) the entirety of the jury charge itself; (2) the evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Id.*

2. The majority cites several federal and Texas appeals court cases for the proposition that we cannot speculate that the jury considered and applied the law consistently to both co-defendants. *See Odom v. United States*, 377 F.2d 853 (5th Cir.1967); *Ruiz v. State*, 641 S.W.2d 364 (Tex.App.-Corpus Christi 1982, no pet.); *see also United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Moranza v. State*, 913 S.W.2d 718 (Tex.App.-Waco 1995, pet. ref'd). However, none of these opinions except *Moranza* concern jury charge error or harm, but only whether a defendant's conviction should be reversed for the reason that verdicts were inconsistent with one another in some respect. If anything, *Moranza* indicates that inconsistent verdicts are relevant to evaluating egregious harm by holding that they did not necessarily reflect harm at all in that case. *See* 913 S.W.2d at 726. In this case, there is no contention or indication in the record that the jury's verdicts were inconsistent. Instead, the controlling issue is simply whether the charge error caused appellant egregious harm, considering every relevant aspect of the case, which necessarily includes how the jury decided the case.

*the death, or he must have intended to cause serious bodily injury and have intentionally or knowingly committed an act clearly dangerous to human life that caused the death of the deceased.* Unless you find beyond a reasonable doubt that the defendant is guilty of murder, or if you have a reasonable doubt thereof, you will acquit the defendant of murder and next consider whether the defendant is guilty of the offense of manslaughter.

(emphasis added). Assuming that the jury followed the instruction contained in the first sentence above, as the majority correctly recognizes that we must,[3] then the jury could have found appellant guilty of murder only if it found that he was the principal actor rather than a mere party.[4]

The majority correctly acknowledges that the evidence was legally and factually sufficient to prove that appellant was guilty as the principal actor in that: (1) appellant, after hearing music that was derogatory to his own, argued and exchanged heated words with the complainant and displayed a pistol to the complainant before the chase and shooting occurred; (2) as the driver of the Expedition, appellant pursued the Caprice after it exited the 610 freeway; (3) numerous bullet holes were found on the driver and passenger sides of the Caprice, each entering from the rear direction; (4) none of the occupants of the Caprice could identify who fired any of the shots from the Expedition, including the fatal shot; and (5) the Expedition was never discovered and thus never inspected or tested by the police.

Similarly, during closing argument, no one mentioned that the jury could convict appellant based solely upon the conduct of Jermarxian. It was, thus, not a theory on which the State relied in the slightest respect. Instead, the prosecutor argued that "[the defendants] are both equally guilty" and that "Jermarxian may have fired the killing bullet, but [appellant] here certainly did his part." She added that appellant had "chased them down" and "tried to kill them, tried to shoot them, tried to commit serious bodily injury." Because the theoretical possibility that the jury could have found appellant guilty based on the erroneous portion of the charge can therefore be supported only by sheer speculation and is contradicted by every aspect of the case that supports any inference on this issue, I would not reverse the conviction based on a finding of egregious harm in the charge.

---

3. *See, e.g., Miles v. State,* 204 S.W.3d 822, 827–28 (Tex.Crim.App.2006).

4. The majority opinion concludes that this paragraph is not among those that apply the law to the facts, even though it ends with the standard "unless you find ... you will acquit" sentence. The majority further concludes that this paragraph merely instructs the jury on the requisite mental state, even though that element has already been covered and this paragraph states, in part, "before a person can be found guilty of murder, he must have ... caused the death, or ... committed an act ... that caused the death...." The majority also concludes that this paragraph could have pertained to Jermarxian rather than appellant even though it refers only to "defendant" and the preceding application paragraph distinguishes clearly between appellant, as defendant, and Jermarxian, and does not refer to Jermarxian as defendant. Although this paragraph does not cure the error, it combines with the other considerations discussed to demonstrate that the harm from the error is not egregious.