Affirmed and Memorandum Opinion
filed March 25, 2010

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00017-CR



Ruben Carlos
Cuellar-Romo, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 230th District Court

Harris County, Texas

Trial Court
Cause No. 1164620



 

MEMORANDUM OPINION 

            Appellant
Ruben Carlos Cuellar-Romo pleaded “guilty” to a charge of aggravated assault,
and elected have a jury decide punishment.  The jury assessed punishment at six
years in the Institutional Division of the Texas Department of Criminal Justice. 
On appeal, Cuellar-Romo contends he was egregiously harmed by the trial court’s
failure to give the jury a reasonable-doubt instruction on extraneous offenses
in the punishment jury charge.  We affirm.

I

            On
April 27, 2008, Cuellar-Romo’s seventeen-year-old daughter reported to the
Harris County Sheriff’s Office that she had been sexually assaulted at a
party.  After an investigation, Cuellar-Romo’s daughter was arrested for making
a false statement, and she gave a written confession to the crime.  She stated
that she made up the story because she was afraid her parents would discover
she was having sex.

            On
April 28, 2008, the day after Cuellar-Romo’s daughter made the report, Cuellar-Romo
went to Carl Wunsche High School in Spring with his daughter and his wife.  Cuellar-Romo
was “agitated and irritable” and wanted to speak to an administrator
immediately.  While Cuellar-Romo and his family were waiting, a student named
Joshua Chapa came into the school.  Joshua was not the suspect Cuellar-Romo’s
daughter had reported, but Cuellar-Romo apparently believed that Joshua was
involved or participated in the alleged sexual assault.  Cuellar-Romo
approached Joshua and asked, “Is your name Chapa?”  Cuellar-Romo then attacked Joshua,
put him in a headlock, and started jabbing him with what appeared to be his
hand.  Cuellar-Romo said, “I told you I was going to get you.”

            Officer
Bernie Saintes with the Spring I.S.D. Police Department was at his desk near
the school’s lobby when Cuellar-Romo attacked Joshua.  He helped rescue Joshua,
after which Cuellar-Romo stated, “He raped my daughter . . . I am dead anyway .
. . I don’t want to say nothing else.”  A large blood-stained knife had dropped
from Cuellar-Romo’s hand and was found on the floor.

            Joshua
had several stab wounds to his abdomen and was bleeding from them.  He was pale
and his heart was racing, and he looked shell-shocked and scared.  Joshua
underwent a three-hour surgery to remove a hematoma, a large pocket of blood
from his abdomen.  After the surgery, he remained in the hospital for several
days.  Joshua lost weight and became uncomfortable around crowds.  His grades
suffered and he missed his SAT test.  He also experienced panic attacks and nightmares.

II

A

            On
appeal, Cuellar-Romo contends the State elicited the following evidence of
extraneous offenses:  (1) testimony from Robert Chapa that Cuellar-Romo’s bond
was revoked because he was making threats from the county jail after his
arrest; (2) testimony from Cuellar-Romo’s expert that while in jail Cuellar-Romo
was having “homicidal ideations” and suicidal thoughts; (3) a reference in Cuellar-Romo’s
medical records that he “may try to hurt somebody”; and (4) testimony from Cuellar-Romo’s
expert that, after his arrest for stabbing Joshua, Cuellar-Romo wanted to “take
his gun, go out, shoot the rest of the boys and then kill himself.”  Cuellar-Romo
concedes his counsel did not object to the trial court’s failure to include a
reasonable-doubt instruction in the jury charge, but contends that he was
egregiously harmed by the omission.

B

            The
State may offer punishment-phase evidence as to any matter the court deems
relevant to sentencing, including evidence of an extraneous crime or bad act
that is shown beyond a reasonable doubt to have been committed by the
defendant.  Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a) (Vernon 2006 &
Supp. 2009).  When evidence of extraneous offenses or bad acts is admitted
during the punishment phase, the trial court is required to instruct the jury
sua sponte on the reasonable-doubt standard of proof.  Huizar v. State,
12 S.W.3d 479, 484 (Tex. Crim. App. 2000) (op. on reh’g).

            The
review of alleged charge error is a two-step process.  Abdnor v. State,
871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); Green v. State, 233
S.W.3d 72, 78 (Tex. App.—Houston [14th Dist.] 2007, pet. ref’d).  First, we
examine the jury charge to see if the trial court erred.  Abdnor, 871
S.W.2d at 731–32; Green, 233 S.W.3d at 78.  Second, if we find that the
trial court erred, we must determine if the harm is sufficient to warrant
reversal.  Abdnor, 871 S.W.2d at 731–32; Green, 233 S.W.3d at
78.  

            In
the absence of a request or objection, jury-charge error does not require
reversal unless it causes “egregious harm.”  Almanza v. State, 686
S.W.2d 157, 171 (Tex. Crim. App. 1984), overruled on other grounds, Rodriguez
v. State, 758 S.W.2d 787 (Tex. Crim. App. 1988).  Egregious harm is a
difficult standard and must be proven on a case-by-case basis.  Ellison v.
State, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002).  The actual degree of
harm must be determined in light of the entire jury charge, the state of the
evidence, including the contested issues and weight of probative evidence, the
argument of counsel, and any other relevant information revealed by the record
of the trial as a whole.  Almanza, 686 S.W.2d at 171.  Errors resulting
in egregious harm are those which affect the very basis of the case, deprive
the defendant of a valuable right, or vitally affect a defensive theory.  Id.
at 172; Green, 233 S.W.3d at 78.  In other words, the error must have
been so harmful that the defendant was effectively denied a fair and impartial
trial.  Green, 233 S.W.3d at 78.  We must determine the impact of the
error on a case-by-case basis.  Zarco v. State, 210 S.W.3d 816, 824
(Tex. App.—Houston [14th Dist.] 2006, no pet.).

C

            Cuellar-Romo
contends the testimony concerning his threats constitutes evidence of extraneous
offenses, and the omission of the reasonable-doubt instruction caused egregious
harm because the prosecutor mentioned this misconduct as a basis for denying
him probation.  Cuellar-Romo points out that, despite being eligible for
probation, he received a six-year sentence.  He further points out that,
because he pleaded “guilty,” there were no jury instructions from the
guilt-innocence phase that would have instructed the jury about the State’s
burden of proof. 

            At
trial, the State presented evidence that Cuellar-Romo was previously convicted
of theft in 1990, and received deferred adjudication for deadly conduct in
2001.  The deadly-conduct offense occurred after Miguel Garcia and some friends
egged Cuellar-Romo’s house.  Garcia had almost returned home when a man pulled
out a firearm and shot at him.  Garcia ran, but the man continued to pursue
him.  None of Garcia’s friends had firearms.  Cuellar-Romo called the local
constable’s office to report criminal mischief at his house.  Sgt. James Rouse
responded to the call and spoke with Cuellar-Romo.  Cuellar-Romo told Rouse
that he went looking for some kids who had egged his house, that he took his
9-millimeter Ruger firearm with him, and that he shot at them when he thought
they pulled a gun.  Rouse found where a bullet had struck the door of a house
in the neighborhood.  Cuellar-Romo was arrested and eventually pleaded “guilty”
to deadly conduct.  At trial, Cuellar-Romo stipulated to being the person who
committed the two offenses. [1]

            Additionally,
during cross-examination of Joshua’s father, Robert Chapa, defense counsel
asked him to identify the person who was making threats against Joshua, and  he
stated, “Well, from what I understood was that your client’s bond was revoked
because he was making threats from jail.”  Upon further questioning, Mr. Chapa
testified that Cuellar-Romo never contacted him personally, and explained that
his understanding regarding the threats came from conversations with two of
Joshua’s friends, who had “received threats on a cell phone.”  

            After
the State presented its case, the defense presented testimony from Cuellar-Romo’s
wife, sister, and twenty-two-year-old son.  They testified that Cuellar-Romo
was a good husband, father, and brother, and that he was a hard worker.  They
also testified that Cuellar-Romo had never been convicted of a felony, and that
in their opinion he should receive probation rather than a prison sentence so
that he could be with his family.

            The
defense’s last witness was Dr. Jacqueline Beckham, a psychiatrist at the Harris
County Jail.  She testified that she met Cuellar-Romo in the county jail in her
capacity as director of an inpatient mental-health unit.  She explained that Cuellar-Romo
was housed in a seclusion or “rubber” room with padded walls, a padded floor,
and no furniture.  Cuellar-Romo initially was diagnosed with major depression
with psychotic features.  She described him as having a “pretty significant
severe dysfunction.”  Dr. Beckham testified that, because of Cuellar-Romo’s
existing depression, his belief that his teenage daughter had been victimized
by a group of boys compromised his ability to think rationally and caused him
to become very paranoid.  She also testified that he responded well to
treatment and that his psychosis has been resolved.  Additionally, Dr. Beckham
testified that Cuellar-Romo was not a sociopath and had expressed remorse for
what he had done.  Nevertheless, she explained that she had opposed Cuellar-Romo’s
release on bail early in his incarceration because he still had psychotic
symptoms, and “a homicidal ideation.”  He also tried to jab a toothbrush down
his throat shortly after he arrived at jail.  

            During
cross-examination, the State questioned Dr. Beckham about entries in Cuellar-Romo’s
medical records, including entries reflecting that after Cuellar-Romo was
arrested he was having “suicidal thoughts” as well as “homicidal ideations”
toward the individuals he believed had raped his daughter, and that “he may try
to hurt somebody.”  Dr. Beckham acknowledged that Cuellar-Romo had stated that he
wanted to “take his gun, go out, shoot the rest of the boys and then kill
himself.”  

            In
closing argument, Cuellar-Romo’s counsel told the jury that it was important
that they take into consideration all the evidence that was presented to them
when determining punishment.  Counsel stressed Cuellar-Romo’s lack of sleep
after finding out his daughter was missing, being informed that she had been
raped, and taking her to school after classes began to avoid other students.  Counsel
also focused on Cuellar-Romo’s motivation for the attack on Joshua—the belief
that that Joshua had been involved in his daughter’s rape—and argued that Cuellar-Romo,
already suffering from depression, “snapped.”  Counsel then discussed Cuellar-Romo’s
arrest and placement in a seclusion cell, as well as his attempt to swallow a
toothbrush to kill himself when he realized what he had done.  Relying on Dr.
Beckham’s testimony concerning Cuellar-Romo’s treatment, counsel also argued
that with continued treatment and medication, Cuellar-Romo was no more likely
than anyone there to commit a future act of violence.  Counsel then asked the
jury to assess probation for Cuellar-Romo’s “horrible mistake.”  Counsel also
brought up the deadly-conduct incident in 2001, arguing that Cuellar-Romo
should not continue to be punished for his past actions.  Counsel further pointed
to Cuellar-Romo’s many years as a coach for youth soccer as evidence that Cuellar-Romo
was not a “monster” who “hates kids” as the State might argue.  In closing,
counsel asked for mercy, and asked the jury to assess a punishment of
probation.

            The
State’s attorney began his closing statement by arguing that Cuellar-Romo
should be held accountable for his actions.  The State’s attorney pointed out
that Cuellar-Romo had made bad choices, not only in this case, but also in 2001
when he shot at Garcia and was convicted of deadly conduct.  Turning to the
charge, the State’s attorney informed the jury that if they chose probation,
the judge would choose the conditions of probation and length of time probation
would be imposed on Cuellar-Romo.  Continuing the theme of accountability, the
State’s attorney reminded the jury of Cuellar-Romo’s actions and his mental
state when he attacked Joshua.  The State’s attorney also discussed Dr. Beckham’s
treatment plan, and argued there was no assurance that Cuellar-Romo would
continue to take the medications he had been prescribed or that he would not get
angry again.  The State’s attorney then discussed Cuellar-Romo’s criminal
history, including the 2001 deadly-conduct conviction, and mentioned the
references in Dr. Beckham’s records to Cuellar-Romo’s threats to get his gun
and kill the rest of the boys and then himself.  The State’s attorney also
discussed the consequences of Cuellar-Romo’s actions on Joshua’s life. 
Finally, the State’s attorney argued against probation, stressing that Cuellar-Romo
did not merely strike Joshua or threaten him with a knife, but stabbed him
repeatedly.  In arguing against probation, the State’s attorney reminded the
jury of Cuellar-Romo’s behavior both in this case and in the 2001 incident.  Although
the State’s attorney noted that Cuellar-Romo could be sentenced to as much as
twenty years in prison, he recommended at least twelve years in prison.

            Because
Cuellar-Romo pleaded “guilty,” the jury was not instructed on the State’s
burden to prove extraneous offenses beyond a reasonable doubt during the
guilt-innocence phase of the trial.  The jury was instructed that it could
assess punishment of confinement in prison for any term of years of not less
than two years or more than twenty years, and in its discretion the jury may
choose to assess a fine not to exceed $10,000 in addition to confinement in
prison.  The jury was also instructed of the circumstances under which it could
recommend that the court grant community supervision.  The jury returned a
verdict of six years in prison and no fine.

            Assuming
admission of the extraneous acts of misconduct, which is the subject of Cuellar-Romo
complaint, required the trial court to include a reasonable-doubt instruction
in the jury charge on punishment, we conclude Cuellar-Romo was not egregiously
harmed by the omission.  The sentence is half as much as the State requested,
and at the low end of the punishment range.  Further, the extraneous misconduct
Cuellar-Romo complains of consisted of a few comments about threats Cuellar-Romo
allegedly made shortly after his arrest.  Cuellar-Romo contends the alleged
threats were unreliable hearsay, but he did not object to the testimony below,
and on appeal he does not contend the evidence was inadmissible.  Further, during
closing argument, the State’s attorney primarily emphasized the charged offense
and its effect on Joshua and his family.  Although the State’s attorney referred
to Cuellar-Romo’s prior convictions several times during closing argument, he referred
to the evidence of Cuellar-Romo’s alleged threats only once.  

            More
significantly, the evidence against Cuellar-Romo was overwhelming and highly
credible.  It included numerous witnesses who testified about Joshua’s
stabbing, the shooting at Garcia, and the impact of the crime on Joshua.  One
of Joshua’s therapists testified that she was treating Joshua for post-traumatic
stress disorder resulting from the assault, and she explained that Joshua’s
symptoms were severe and the disorder affects his daily life “in every way.”  The
jury also heard from Joshua, who described the assault in detail, his hospital
stay, and the effect the assault had on his life.  

            Assuming
the trial court erred in failing to include a reasonable-doubt instruction
regarding extraneous offenses, we hold any error was harmless; Cuellar-Romo did
not suffer egregious harm and was not denied a fair and impartial trial.  See
Almanza, 686 S.W.2d at 171–72; Green, 233 S.W.3d at 78.  We therefore
overrule Cuellar-Romo’s issue.

*
* *

            Having
overruled Cuellar-Romo’s issue, we affirm the trial court’s judgment.

 

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices Yates,
Seymore, and Brown.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1]
Much of the State’s brief focuses on the two extraneous offenses that were
admitted during trial—appellant’s prior theft conviction and the prior deferred
adjudication for deadly conduct—but appellant concedes in his brief that this
evidence did not require a reasonable-doubt instruction.  See Bluitt v.
State, 137 S.W.3d 51, 54 (Tex. Crim. App. 2004) (holding reasonable-doubt
instruction was not required when the evidence of the appellant’s criminal
behavior was in the form of prior offenses which had been subjected to judicial
testing under the proper burden and the burden had been met).