**Ronald ROBINSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–07–00800–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 14, 2008.

Kenneth Goode, Houston, TX, for Appellant.

Dan McCrory, Assistant District Attorney, Charles A. Rosenthal, Jr., District Attorney–Harris County, Houston, TX, for Appellee.

Panel consists of Justices TAFT, JENNINGS and BLAND.

## OPINION

JANE BLAND, Justice.

A jury found Ronald Robinson guilty of capital murder, and, the State not having sought the death penalty, the trial court sentenced him to a term of life imprisonment without parole. Tex. Penal Code Ann. § 19.03 (Vernon Supp.2007). Robinson appeals, contending that his conviction should be reversed because (1) the court's charge to the jury violated his constitutional right to due process by erroneously instructing the jury that it could find him guilty of capital murder based on conduct neither alleged in the indictment nor statutorily defined as capital murder; (2) the trial court erred in admitting hearsay testimony through three witnesses concerning statements made to them by Robert Mason, the individual who shot the complainant; and (3) the trial court erred in sentencing him under a statute that became effective after the date of the offense and has only prospective application. We reverse the judgment and remand the cause for a new trial.

## Background

During the 1980's, Jimmy Sims worked as a coach in a boxing gym in his spare time. Robinson's wife at the time, Flor, met Sims when he began to coach her son, Ronnie. Sims and Flor began an extramarital affair that lasted approximately six years.

By approximately 1990, both Robinson and Sims's wife, Jeneanne, had discovered the affair. Jeneanne confronted Sims about the affair, and Sims ended it. Robinson reacted to the news by threatening and stalking both Sims and his wife. Robinson called the Simses' residence and threatened that he would come and "take care of" Sims and get "payback" for what Sims had done to his family. Sometimes, Robinson called the Simses and beat Flor during the phone call so that the Simses could hear her screams. Robinson wrote provocative letters to the Simses and signed them as if they were from Flor. The Simses also noticed that Robinson routinely spent time parked outside the Simses's house, particularly when Sims left for work. Once in early 1991, Jeneanne saw Robinson brandish a gun while he drove by the house.

By the summer of 1991, Robinson was walking onto the Simses' property and confronting the Simses face-to-face. Once, he entered the Simses' garage with his teen-aged son Ronnie and four of Ronnie's friends. With Sims inside the house recuperating from a work injury, Jeneanne headed into the garage alone and told Robinson to leave. Robinson angrily responded that he and the boys were there to "find out what's going on" and "settle this." On another occasion, Jeneanne saw several teen-aged boys behind her back fence firing pistols into the air. Over the course of two years, Robinson had threatened to kill Sims so many times and in so many ways that Jeneanne lived in fear of Robinson, and Sims became resigned to what he perceived as his fate, telling his wife that "he knew he was going to die."

On September 5, 1991, Jeneanne was accompanying Sims outside as he left for work. Noticing that he did not have his pager with him, Sims asked Jeneanne to retrieve it from the house. While Jeneanne was inside, she heard what she first thought sounded like fireworks. Quickly realizing that she actually had heard gunshots, Jeneanne grabbed a pistol from its place on top of the refrigerator and ran outside. She saw two individuals, wearing knit caps and with their faces covered by

bandanas, still shooting at Sims. She lifted the pistol and screamed at them repeatedly to "stop it" and "get out of there." Both individuals pointed their guns at her, then turned and ran to the middle of the street. Jeneanne ran toward them and pointed the pistol at them again, and they stopped and raised their guns a second time, but eventually turned and fled down the street.

Sims died from his injuries. After his death, Robinson continued to park outside the Sims home from time to time. The police investigated the crime without immediate success, and the investigation stalled. In 2005, the police department retrieved the cold case file and began to work on it again. Detective Fikaris initially helped with the renewed investigation and located a number of possible witnesses, including Mason and his former girlfriend, Mason's former friends, and Robinson's son, Ronnie.

The renewed investigation led to Robinson's indictment, trial, and conviction. Robinson timely filed this appeal.

### Discussion

*Charge Error*

 Robinson contends that his conviction should be reversed because the charge submitted to the jury violated his due process rights by erroneously allowing the jury to find Robinson guilty of capital murder based on conduct that was not alleged in the indictment and does not satisfy any theory found in the capital murder statute. *See* TEX. PENAL CODE ANN. § 19.03. The State does not defend the propriety of the charge, but asserts that any error does not warrant reversal.

To determine whether the jury charge contains reversible error, we first decide whether error exists. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex.Crim.App.2003). If we conclude that it does, we examine whether the error harmed the defendant. *Id.*; *see* TEX.CODE CRIM. PROC. ANN. art. 36.19 ("Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial.").

 The trial court's charge must fully instruct the jury on the law applicable to the case and apply that law to the facts adduced at trial. *Gray v. State*, 152 S.W.3d 125, 127 (Tex.Crim.App.2004); *see* TEX.CODE CRIM. PROC. ANN. art 36.14 (Vernon 2007). Robinson's challenge concerns whether the conduct described in the charge constitutes capital murder, as the jury was instructed. The Penal Code defines the offense of capital murder as murder plus one of the following enumerated circumstances:

(1) the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman;

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat under Section 22.07(a)(1), (3), (4), (5), or (6);

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration;

(4) the person commits the murder while escaping or attempting to escape from a penal institution;

(5) the person, while incarcerated in a penal institution, murders another:

(A) who is employed in the operation of the penal institution; or

(B) with the intent to establish, maintain, or participate in a combination or in the profits of a combination;

(6) the person:

(A) while incarcerated for an offense under this section or Section 9.02, murders another; or

(B) while serving a sentence of life imprisonment or a term of 99 years for an offense under Section 20.04, 22.021, or 29.03, murders another;

(7) the person murders more than one person:

(A) during the same criminal transaction; or

(B) during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct;

(8) the person murders an individual under six years of age; or

(9) the person murders another person in retaliation for or on account of the service or status of the other person as a judge....

TEX. PENAL CODE ANN. § 19.03(a). The indictment against Robinson charged that he "unlawfully, intentionally and knowingly cause[d] the death of JIMMY SIMS, ... by employing ROBERT MASON for REMUNERATION AND THE PROMISE OF REMUNERATION, to wit: MONEY AND A FIREARM, to SHOOT THE COMPLAINANT WITH A DEADLY WEAPON, NAMELY, A FIREARM." *See* TEX. PENAL CODE ANN. § 19.03(a)(3). The charge instructed the jury as follows:

Now, if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 5th day of September 1991, the defendant, Ronald Robinson, did then and there unlawfully, intentionally or knowingly cause the death of Jimmy Sims, by employing Robert Mason for remuneration or the promise of remuneration, to-wit: money and/or a firearm, to shoot Jimmy Sims with a deadly weapon, namely, a firearm; or

If you find from the evidence beyond a reasonable doubt that the defendant, Ronald Robinson and Robert Mason entered into an agreement to commit the felony offense of aggravated assault of Jimmy Sims, and pursuant to that agreement, if any, they did carry out their conspiracy and that in Harris County, Texas, on or about the 5th day of September 1991, while in the course of committing such aggravated assault of Jimmy Sims, Robert Mason intentionally caused the death of Jimmy Sims by shooting Jimmy Sims with a deadly weapon, namely, a firearm, and the murder of Jimmy Sims was committed in furtherance of the conspiracy and was an offense that the defendant should have anticipated as a result of carrying out the conspiracy, then you will find the defendant guilty of capital murder, as charged in the indictment.

Robinson's specific complaint concerns the second paragraph, which, he observes, instructs the jury that it could find him guilty of capital murder for conduct that does not constitute the offense of capital murder—that is, none of the nine statutory circumstances that raise a murder to a capital murder are included. We agree. The second paragraph submits the issue of murder under a conspiracy to commit felony murder theory, but does not require the jury to find the applicable aggravating factor—that Robinson employed Mason for remuneration or the promise of remuneration as part of the conspiracy. This por-

tion of the court's charge neither tracks the indictment nor satisfies the definition of capital murder contained in the statute. *See* TEX. PENAL CODE ANN. §§ 9.02, 19.03 (Vernon 2003 & Supp.2007). The conduct described in the second paragraph, if found beyond a reasonable doubt, would support a conviction of Robinson only as a co-conspirator to commit felony murder, not to capital murder.

Robinson contends that the charge error violated his federal due process rights because it denied him notice and the opportunity to prepare a defense. *See Jackson v. Virginia,* 443 U.S. 307, 314, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979) ("It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process."), *quoted in Gollihar v. State,* 46 S.W.3d 243, 246 (Tex.Crim.App.2001). In considering whether harm results from a general verdict of guilt rendered on a jury submission setting forth two alternative grounds, one valid and the other invalid, we first observe that "where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground." *Griffin v. U.S.,* 502 U.S. 46, 53, 112 S.Ct. 466, 471, 116 L.Ed.2d 371 (1991); *see also Green v. State,* 233 S.W.3d 72, 80 & n. 7 (Tex.App.–Houston [14th Dist.] 2007, pet. ref'd) (finding egregious harm and reversing and remanding for new trial because jury verdict was based on charge that contained several valid legal theories and one invalid theory); *Guevara v. State,* 191 S.W.3d 203, 208 (Tex.App.–San Antonio 2005, pet. ref'd)

(holding that charge that instructed jury it could find defendant guilty of murder under one of two possible theories, one of which was legally inadequate party charge, required reversal of conviction; court could not presume jury based verdict on legally sufficient ground). For this reason, the federal Constitution requires that we set aside a verdict "in cases where the verdict is [constitutionally] supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957), *overruled on other grounds in Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The Supreme Court has explained the rationale for this rule:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, *or fails to come within the statutory definition of the crime.* When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.

*Griffin,* 502 U.S. at 59, 112 S.Ct. at 474[1] (emphasis added); *cf. Hutch v. State,* 922 S.W.2d 166, 172 (Tex.Crim.App.1996) (presumption that jury understood and followed court's charge made erroneous instruction in application paragraph was important factor supporting conclusion

---

1. The Court contrasted this result to situations in which the jury enters a general verdict of guilt on a question submitting various grounds in the disjunctive in the absence of legally sufficient evidence on some, but not all, of those grounds, which generally do not require reversal. *See Griffin v. United States,* 502 U.S. 46, 59, 112 S.Ct. 466, 474, 116 L.Ed.2d 371 (1991) ("Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence.").

that caused egregious harm).[2] Here, the charge presented two alternate grounds, under either of which the jury could find Robinson guilty of capital murder. One of these grounds was legally adequate and the other was legally defective. Accordingly, we hold that the charge contains legal error.

### Standard for Reversal

■ Robinson did not preserve error by objecting to the erroneous submission and concedes that we must apply the egregious harm standard to determine whether the error requires reversal.[3] *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985). *Almanza* held that jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Id.* In examining the record to determine whether the charge error is egregious, we consider the entirety of the charge, the evidence (including the contested issues and weight of the probative evidence), the arguments of counsel, and any other relevant information revealed by the record of the trial. *Id.; see Allen v. State*, 253 S.W.3d 260, 264 (Tex.Crim.App.2008); *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex.Crim.App.2006).

### Jury charge as a whole

The charge submits disjunctive theories of capital murder. It informed the jury of the elements of capital murder under either of the two theories, and later instructed the jury to find the defendant guilty of capital murder if it found those elements beyond a reasonable doubt. As explained above, only one of the two theories constitutes capital murder in Texas. Nothing in the charge could have alerted the jury to a problem with the instruction because the error was consistent throughout.

The copy of the charge returned by the jury with the signed verdict contains handwritten interlineations as follows:

> Before you would be warranted in finding the defendant guilty of capital murder, you *must find* from the evidence beyond a reasonable doubt *that on the occasion* in question the defendant . . . *intentionally employed* Robert Mason *to kill* Jimmy Sims; . . . *or you must find* from the evidence beyond a reasonable doubt that on the occasion in question the defendant . . . *entered into* an *agreement* with Robert Mason to commit the *felony offense* of *aggravated assault* of Jimmy Sims . . . and pursuant to that agreement they did carry out their conspiracy and while in the course of committing said conspiracy, Robert Mason intentionally caused the death of Jimmy Sims . . . .

(emphasis in the original). These interlineations show a focus on the different ele-

---

2. As a consequence of allowing the jury to find Robinson guilty of capital murder based on conduct that did not amount to capital murder, the charge error authorized the jury to assess punishment at confinement for life, as opposed to somewhere in the range of five to ninety-nine years. *Compare* TEX. PENAL CODE ANN. § 12.32(a) (Vernon 2003) (providing that individual adjudged guilty of first-degree felony subject to sentence of imprisonment of not more than 99 years or less than 5 years) *with* TEX. PENAL CODE ANN. § 12.31(a) (Vernon 2003) (hist. note) (providing that, at time Robinson committed offense, individual adjudged guilty of capital felony subject to sentence of life imprisonment or death).

3. Because of this concession, we do not reach the question of whether our finding of charge error should result in automatic reversal without determining whether egregious harm exists as required by *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984). *See Green v. State*, 233 S.W.3d 72, 80 n. 7 (Tex. App.–Houston [14th Dist.] 2007, pet. ref'd) (acknowledging that federal courts would automatically reverse on finding that charge submitted valid and invalid theories, but nevertheless undertaking *Almanza* analysis).

ments of capital murder under the murder for hire theory and the elements of the constitutionally defective alternative theory offered in the court's charge. The record thus supports the presumption that the jury understood and followed the charge. *See Hutch v. State,* 922 S.W.2d 166, 172 (Tex.Crim.App.1996). Accordingly, this consideration favors reversal.

*Evidentiary record*

Neither Robinson nor Mason testified at trial. The State sought to prove its case through statements that Mason made to his former friends, Javier Martinez and Gregory Fuentes, and his former girlfriend, Kim Martinez.[4]

Javier Martinez, who drove the getaway car, testified that he drove Mason to a meeting with Robinson several days before the murder, after which Mason told him that Robinson gave Mason a .45–caliber gun as partial payment for agreeing to beat Sims. Javier Martinez recounted that he agreed to drive Mason to Sims' house based on his understanding that Mason would beat Sims, not kill him.[5]

On the day of the murder, Javier Martinez drove Mason to Sims' house. From his position on a nearby street, he heard the gunfire. Javier Martinez recalled that Mason had a gun when he left the car, but could not confirm whether it was the same weapon Mason received from Robinson. The State proved that Sims died from bullets shot from a .45–caliber gun.

Gregory Fuentes testified that Mason told him before the incident that he had agreed to beat Sims. Fuentes went with Mason to Robinson's home several days after the murder and heard Mason tell Robinson that he had shot and killed Sims.

According to Fuentes, Robinson acted frustrated and surprised when Mason said that he had shot and killed Sims. After that exchange, Fuentes saw Robinson give Mason some money. Fuentes testified that Mason never told him that Robinson gave him a gun. Mason did, however, ask Fuentes to help Mason get rid of the murder weapon. Fuentes put Mason in contact with a worker at his uncle's shop who destroyed the gun with a blow torch, and then Mason threw the pieces into the Ship Channel.

In contrast, Kim Martinez testified that Mason told her Robinson paid him to kill Sims. Kim recalled that Mason did not tell her about the payment until the day after the murder. On cross-examination, Kim admitted that she did not mention that Mason had received payment from Robinson in her initial statement to the police detectives.

Our review of the record leads us to conclude that a rational juror could have found Robinson guilty beyond a reasonable doubt of capital murder based on either the valid theory or the invalid theory. *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Drichas v. State,* 175 S.W.3d 795, 798 (Tex. Crim.App.2005). Because it is as likely that the jury relied on the valid theory as the invalid theory to find Robinson guilty, and it is impossible to tell which, this factor also favors reversal.

*Arguments of counsel*

In its opening argument, the State declared that the jury would hear that Mason got into Robinson's car where "a deal was reached" that Mason would do a "beatdown," and that Mason was the triggerman, but never explicitly mentioned that

---

4. Kim Martinez is not related to Javier Martinez.

5. According to Javier Martinez, the fact that Mason was carrying a gun was not exceptional; he testified that Mason carried a gun "between 70 to 80 percent of the time."

the State would have to prove that Mason received payment from Robinson.

During the State's closing argument, the prosecutor mistakenly told the jurors that the charge contained the "for hire" element in the second alternative ground for capital murder:

> There are essentially two ways for you to find someone, this Defendant, guilty of capital murder. What this says right here is: You can find that he intentionally or knowingly hired Robert Mason with remuneration or the promise of it to kill Jimmy Sims. Or, you can find that there was a conspiracy between the two of them to commit aggravated assault, he hired Bob Mason to commit aggravated assault, the murder was in furtherance of that aggravated assault, and he should have anticipated it.

> And, quite honestly, six of you could think one, six the other, or several of you could think I'm not sure which, but I am sure beyond a reasonable doubt that it's one of these two. Okay? And if I have done that, what this charge tells you is that the Defendant gets convicted of capital murder....

Later, the prosecutor told the jury that it could convict Robinson of capital murder if the State has "proved to you beyond a reasonable doubt that either [Robinson] hired Robert Mason to commit murder or he hired Robert Mason and there was a conspiracy to commit aggravated assault and that the murder was committed in furtherance of that conspiracy and he should have anticipated it." In short, the prosecutor twice misstated that the alternative ground for finding Robinson guilty of capital murder as if it contained the omitted element. These misstatements could have served only to confuse the jury about the elements required under the capital murder submission. And, the prosecutor told the jury that they could reach agreement if each juror chose only one of the two theories.

In closing, the State focused on rebutting the defense argument that the State's evidence, if believed, proved only assault or aggravated assault, and marshaled the evidence that could support a finding of capital murder under the first alternative. Contrary to its position on appeal, however, the State did not rely on the first alternative to the exclusion of the second. The State continued to sanction the possibility that the jury could find Robinson guilty under the second alternative, arguing that Robinson should have anticipated that Mason would kill Sims after giving Mason "a gun as payment to go do a beatdown." Consequently, this factor also favors reversal.

### Conclusion

The charge instructed the jury to find Robinson guilty of capital murder if it found either that Robinson engaged in conduct that amounted to capital murder as alleged in the indictment and described in the capital murder statute, or in other conduct that does not constitute capital murder under the statute. It is uncontested that the second instruction is not legally supportable, and it is impossible to tell from the record which ground for conviction the jury selected. Having conducted an *Almanza* harm analysis, we hold that appellant was egregiously harmed by the error in the jury charge. We therefore reverse the judgment and remand the case to the trial court for a new trial.