Opinion issued March 25, 2010

 

 

 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 
 


 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 


 
 

 
 



NO. 01-09-00156-CR

 


 
 

 
 



KEYO KERSHUN KINGSLEY, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 


 
 

 
 
 



On Appeal from the 338th District Court

Harris County, Texas

Trial Court Cause No. 1093652

 


 
 

 
 
 



MEMORANDUM OPINION

The trial court found appellant, Keyo
Kershun Kingsley, guilty of the offense of aggravated assault with a deadly
weapon[1]
and assessed his punishment at confinement for 10 years.  In his sole issue, appellant contends that the
evidence is legally and factually insufficient to support his conviction.

          We
affirm.

Background

After hearing the evidence presented
in two separate cases tried together in a single proceeding, the trial court
found appellant guilty of assaulting the complainant, Pate Muse, with a deadly
weapon, but not guilty of assaulting Sir Bell with a deadly weapon. 

The complainant testified that on the
night of November 18, 2008, he attended a party at the Best Western Inn on FM
1960.  When the party had ended, the
complainant, driving his white SUV, attempted to exit the parking lot by way of
a private drive that ran from the motel to FM 1960, but a car, driven by Sir
Bell, stopped in front of the complainant and blocked the exit.  When the driver of a blue Buick Park Avenue,
which was in the line of cars behind the complainant, tried to go around him on
his passenger’s side, the complainant accidentally caused his SUV to collide
with the blue Park Avenue.  The blue Park
Avenue “swerved in the ditch a little bit,” went a little farther, and then stopped.  Unsure if the two cars had collided, the
complainant looked at his passenger, Daniel Giles.  Hearing gunshots, the complainant turned and
saw the gunshots, one of which struck his left arm, coming from the direction
of the blue Park Avenue.  When the complainant
looked up, he saw the blue Park Avenue speeding away.  On cross-examination, the complainant conceded
that he could not identify the person who had shot him “because it was dark
that night.”  

Sir Bell testified that before going
to the party, he had gone to appellant’s home, where he saw two cars parked in
appellant’s driveway, a purple Chevrolet Caprice and a Buick Park Avenue.  Bell explained that about five cars, “three”
of which belonged to appellant, left appellant’s house to go to the party.  Appellant drove a “black [C]aprice,” and Bell
drove a “gray truck.”  When the group
arrived at the motel, the party was ending, and they stayed only briefly as appellant
remained in the black Caprice.  As Bell was
leaving, he stopped his gray truck just before exiting the parking lot to talk
to someone in another car, and he blocked the white SUV driven by the
complainant from leaving the parking lot. 
Bell then saw a “blue car” in the group of cars trying to exit, but he
did not recognize the “tall, dark skin person,” who was driving the blue car, “as
one of the people that [he] had seen that night.  “The blue car swung around the white [SUV,]
[and] [t]he white [SUV] hit the blue car.” 
As the blue car drove towards FM 1960, the driver, from about “30 feet –
35, 40 feet” away, “started shooting back towards the rest of the vehicles.”  Although he could not identify the driver of
the blue car, Bell saw the driver “holding a gun out the window shooting.”  

Bell admitted that in his statement previously
made to Harris County Sheriff (“HCS”) Sergeant M. Schmidt, he had identified
appellant as the driver of the blue car from which the shots were fired.  However, Bell denied previously telling
Schmidt or Giles that he was “concerned about retaliation” from appellant or
his family.  Bell explained that he had
identified appellant as the shooter to Schmidt because Giles had, on the day
before Bell gave his statement to Schmidt, told Bell that appellant shot him. 

On
cross-examination, Bell stated that he identified appellant to Sergeant Schmidt
as the shooter because he was “heavily medicated” and Giles “had already told
[him] that it was [appellant],” not because he actually saw appellant shooting
at him.  Bell conceded that he had seen appellant’s
black Caprice at the party, but he did not see it again after he had been shot.

Dewarence Abbs, a friend of
appellant’s, testified that he, Giles, and appellant’s two brothers, Demetries
Amos and Kristian Williams went to the party in different cars, three of which
belonged to appellant, and one of which belonged to Williams and Giles.  Abbs drove a blue “Park Avenue,” Williams another
“Park Avenue,” “blue . . . with black rims,” and Giles yet another “Park
Avenue.”  Abbs explained that appellant
left the party in the blue Park Avenue that Abbs drove to the party and Abbs
left the party in a “bluish-purple” Caprice, which belonged to appellant.  As he was leaving the party, Abbs saw the
white SUV hit the blue Park Avenue that appellant was driving.  Moments later, he then saw appellant “start[]
shooting” back at the vehicles from “outside” the blue Park Avenue.

On cross-examination, Abbs explained
that the car from which the shots came “looked like [appellant’s car]” and he
“[assumed] it was [appellant] because  .
. . [he] thought that [the car] was one of [appellant’s] cars.”  On redirect examination, Abbs again identified
the blue Park Avenue that appellant had been driving when he left the party as
the car from which the shots were fired and said, “I saw [appellant]” shooting.  He admitted that in the statement that he had
previously made to Sergeant Schmidt he had stated that “[appellant] stopped and
opened his door and got out of his car and started shooting.”  Abbs also admitted that he was nervous about
testifying “because of what might happen.”[2]  Although, on further cross-examination, Abbs
clarified that he was just “nervous about being in court,” on further re-direct
examination, he explained that he was “afraid” of what Williams, appellant’s
brother, might do.

Sergeant M. Schmidt testified that he
investigated the shooting and interviewed Bell at the hospital, where Bell was
“coherent and conscious” and not impaired. 
Bell, “from his own personal knowledge,” told Schmidt that appellant was
the shooter and “he saw [appellant].” 
Bell explained to Schmidt that “he was concerned about making a
statement and identifying [appellant] because [Giles]     . . . is a friend of [appellant] and
[Giles] knew where [Bell] lived.”  

Standard of Review

          We
review the legal sufficiency of the evidence by considering all of the evidence
in the light most favorable to the verdict to determine whether any rational
trier of fact could have found the essential elements of the offense beyond a
reasonable doubt.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)
(citing Jackson v. Virginia, 443 U.S.
307, 318–19, 99 S. Ct. 2781, 2788–89 (1979)). 
In doing so, we give deference to the responsibility of the fact-finder
to fairly resolve conflicts in testimony, to weigh evidence, and to draw
reasonable inferences from the facts.  Id. 
However, our duty requires us to “ensure that the evidence presented
actually supports a conclusion that the defendant committed” the criminal
offense of which he is accused.  Id. 


          In
a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is
so obviously weak as to undermine confidence in the jury’s determination, i.e.,
that the verdict seems “clearly wrong and manifestly unjust,” or the proof of
guilt, although legally sufficient, is nevertheless against the great weight
and preponderance of the evidence.  Watson v. State, 204 S.W.3d 404, 414–15
(Tex. Crim. App. 2006).  We note that the
fact finder is in the best position to evaluate the credibility of witnesses,
and we afford due deference to the fact finder’s determinations. Marshall v. State, 210 S.W.3d 618, 625
(Tex. Crim. App. 2006).  Although we
should always be “mindful” that a fact finder is in the best position to decide
the facts and that we should not order a new trial simply because we disagree
with the verdict, it is “the very nature of a factual-sufficiency review that   . . .
authorizes an appellate court, albeit to a very limited degree, to act in the
capacity of a so-called ‘thirteenth juror.’” 
Watson, 204 S.W.3d at 414,
416–17.  Thus, when an appellate court is
“able to say, with some objective basis in the record, that the great weight
and preponderance of the (albeit legally sufficient) evidence contradicts the [fact
finder’s] verdict[,] . . . it is justified in exercising its appellate fact
jurisdiction to order a new trial.”  Id. at 417.

Legal and Factual Sufficiency

          In
his sole issue, appellant argues that the evidence is legally and factually
insufficient to support his conviction because the trial court, based on the
“same evidence,” found him not guilty of assaulting Sir Bell in “the very same criminal
episode.”  He asserts that “no credible
evidence” was presented to “definitely identify him” as the individual who shot
the complainant.

A person commits the offense of
aggravated assault if the person commits assault and “uses or exhibits a deadly
weapon during the commission of the assault.” 
Tex. Penal Code Ann. §
22.02(a)(2) (Vernon 2003).  

We first note that inconsistent
verdicts in prosecutions based on the same evidence do not require a reversal on
the ground of legal or factual insufficiency of the evidence.  See Green
v. State, 233 S.W.3d 72, 84 (Tex. App.—Houston [14th Dist.] 2007, pet.
ref’d); Moranza v. State, 913 S.W.2d
718, 724 (Tex. App.—Waco 1995, pet. ref’d); see
Ruiz v. State, 641 S.W.3d 364, 366 (Tex. App.—Corpus Christi 1982, no pet.)
(fact-finder’s desire to be lenient may lead to inconsistent verdicts).  To assess a reason for an inconsistency would
necessarily require that we engage in “pure speculation,” which we will not do.  Green,
233 S.W.3d at 84 (quoting United States
v. Powell, 469 U.S. 57, 66, 105 S. Ct. 471 (1984)).  Instead, we review the legal and factual sufficiency
of the evidence supporting the conviction challenged on appeal.  Moranza,
913 S.W.2d at 724. 

In support of his legal sufficiency
challenge, appellant attacks the credibility of Bell.  He emphasizes that Bell “was under heavy
medication” when he identified appellant as the shooter to Sergeant Schmidt,
and Bell only identified appellant because Giles had told him that appellant
was the shooter.  He also emphasizes that
although the complainant testified that the shots came from a “white Buick,”
Bell testified that they came from a “black car”; although Abbs stated that the
shooter stood outside of the car, Bell testified that the shooter fired the
shots from within the car; Abbs was “less than credible” because he had a
criminal record; the firearm from which the shots were fired was never
recovered; and there is no evidence that appellant had a firearm in his
possession on the night of the shooting.

The
gist of appellant’s complaints is that Bell and Abbs were not credible.  However, the fact-finder is the exclusive
judge of the credibility of witnesses and the weight to be given their
testimony; it is the exclusive province of the fact-finder to reconcile conflicts
in the evidence.  Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).  

Here,
the complainant testified that he had accidentally caused his SUV to collide
with a Buick Park Avenue, and after the car stopped further down the road, he
was wounded by shots fired from the direction of the car.  Even disregarding the testimony of Bell,
Abbs, a friend of appellant, testified that he saw appellant driving his blue
Park Avenue, the complainant’s SUV collide with the blue Park Avenue, and
appellant fire the shots that injured the complainant.  Although evidence of his prior convictions
was admissible for impeachment purposes, the fact that Abbs had prior
convictions for the state jail felony offense of possession of narcotics and
the misdemeanor offense of possession of marijuana did not render his testimony
inherently unreliable and legally insufficient to support a conviction.  See Sharp
v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (stating that “witness
may be believed even though some of his testimony may be contradicted”); Houston v. State, 667 S.W.2d 157, 160 (Tex.
App.—Houston [14th Dist.] 1982, no pet.) (fact-finder could have believed
witness with “numerous” prior convictions).  Although the trial court, as fact-finder, could
consider Abbs’s prior convictions in assessing his credibility, it was still
free to find his testimony credible.  Wesbrook, 29 S.W.3d at 111; Sharp, 707 S.W.2d at 614.  Viewing the evidence in the light most
favorable to the verdict and resolving all conflicts in the testimony in favor
of that verdict, a reasonable trier of fact could have found beyond a
reasonable doubt that appellant assaulted the complainant with a deadly weapon.  Accordingly, we hold that the evidence is
legally sufficient to support appellant’s conviction.

In support of his factual sufficiency
challenge, appellant re-urges the same arguments made in his legal sufficiency
challenge.  He further asserts that “the
evidence does not clearly establish [appellant] was in the car near the scene
of the shooting.”  It is true that Bell
testified that appellant drove a “black [C]aprice” to the party; he did not see
appellant change vehicles; he only saw “arms hanging out of the window” from
the blue car from which the shots were fired; and he could not see the
shooter.  Bell also testified that the
statement that he gave to Sergeant Schmidt was a combination of facts from his
own personal knowledge and information that Giles had given him, specifically
that appellant was the shooter and had switched from driving the “black [C]aprice”
when he arrived at the party to driving “his blue Buick” when he left the party.  It is also true that Abbs testified that he
“assumed” that appellant was the shooter because the shots were fired from one
of appellant’s cars, not that he actually saw appellant firing at the other
cars.  Moreover, the complainant could
not identify the individual who fired the shot that injured him,[3]
and no firearm matching the bullets, jackets, and casings found at the scene
was recovered from appellant or any of his vehicles.  

We again note that the trial court
was the exclusive judge of the credibility of witnesses and the weight to be
given their testimony.  See Wesbrook,
29 S.W.3d at 111.  Also, the fact that
the firearm used in the shooting was not recovered does not render the evidence
insufficient.  See Guevara v. State, 152
S.W.3d 45, 49 (Tex. Crim. App. 2004). 
Circumstantial evidence is as probative as direct evidence and is alone
sufficient to establish guilt.  Id. 
For example, in In re A.P., the
complainant was unsure of the identity of a second shooter and a second firearm
had not been recovered by police officers.  59 S.W.3d 387, 391 (Tex. App.—Fort Worth 2001,
no pet.).  The evidence showed that a
person wearing a white shirt was a passenger in the car from which shots were
fired at the complainant, the complainant had seen the defendant wearing a
white shirt, the defendant had been in the car with the other shooter just
before the shots were fired, a gun was found near the defendant in the car, and
the defendant was with the other shooter shortly after the shooting.  Id.  The court held that this evidence was
sufficient to show the defendant was one of the shooters even though the second
firearm was not recovered.  Id. 


Likewise, the trial court in this
case could reasonably have found that appellant fired the shot that injured the
complainant.  The trial court could have
found that appellant drove to the party in one car and, at the party, switched
to driving the blue Buick Park Avenue, which later collided with the
complainant’s white SUV.  Although Abbs,
on cross-examination, stated that he had “assumed” that appellant was the
shooter, he clearly stated on direct examination, and clarified on redirect
examination, that he “saw” appellant shoot in the direction of the complainant
after appellant had gotten out of his blue Park Avenue.  Moreover, the trial court, in regard to their
inconsistent testimony, could have reasonably believed that both Abbs and Bell
were intimidated by appellant and his brother, Williams. 

We conclude that the verdict is not
“clearly wrong and manifestly unjust” and the proof of guilt is not against the
great weight and preponderance of the evidence. 
See Watson, 204 S.W.3d at
414–15.  Accordingly, we hold that the
evidence is factually sufficient to support appellant’s conviction.

We overrule appellant’s sole issue.

Conclusion

          We
affirm the judgment of the trial court.

 

 

 

                                                                             Terry
Jennings

                                                                             Justice

 

Panel consists of Justices Jennings,
Hanks, and Bland

Do not publish.  Tex.
R. App. P. 47.2(b).











[1]           See
Tex. Penal Code Ann. §
22.02(a)(2) (Vernon 2003).

 





[2]           Abbs
began “sweating profusely” while testifying, and the court took a short recess.

 





[3]           In his appellate brief, appellant
asserts that the complainant said the shots were fired from a “white
Buick.”  A careful review of the
reporter’s record shows that appellant has misinterpreted the complainant’s
testimony:  

 

[Trial
Counsel]:        You say the car that was
. . . coming out in front of the parking lot . . . that was a white [Buick],
you believe?  

 

[Witness]:                  Yes,
ma’am, I believe. 

 

The complainant’s testimony
was that the “white Buick” was the car that blocked the other cars from leaving
the parking lot, not the car from which the shots were fired.  The complainant testified, “I was trying to
come out, but this one—this [white] Buick right here was in my way.”