Affirmed and Memorandum Opinion filed May 24, 2011.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-10-00357-CR



 

Marcus Marquis Pruitt, Appellant

V.

The State of Texas, Appellee

 



On Appeal from the 180th
District Court

Harris County, Texas

Trial Court Cause No. 1201763



 

MEMORANDUM  OPINION

 

A jury found appellant Marcus Marquis Pruitt guilty
of possessing between four and 200 grams of cocaine by aggregate weight,
including any adulterants or dilutants, with the intent to deliver.  The jury assessed
an enhanced sentence of imprisonment for 35 years.  We affirm. 

BACKGROUND

Houston Metro Police Department Officer Robert Smith
was on patrol at about 3:00 a.m. when he found appellant unconscious behind the
wheel of his idling car at the intersection of Austin Street and Gray Street in
Houston, Texas, on February 2, 2009.  Officer Smith testified that he turned on
his emergency lights and “hit the siren a couple of times,” but that appellant
did not wake up until after Officer Smith knocked on the window of appellant’s
car and yelled for “a minute or two.”  Officer Smith instructed appellant to
put the car in park, turn off the engine, and exit the car; appellant complied. 
Officer Smith testified that appellant’s “eyes were glassy” and he “had an odor
of alcohol on or about his person.”  Officer Smith also testified that
appellant “had a little bit of swaggering and was unsteady on his feet.” 
Because he believed appellant to be intoxicated, Officer Smith arrested appellant
for public intoxication and placed him in the patrol vehicle.[1] 
Officer Smith performed a search of appellant’s person and discovered $901 in cash;
appellant stated that he received the money from working and gambling earlier
that day.  

Officer Smith testified that he arranged for
appellant’s car to be towed because appellant’s car was in the middle of the
intersection and appellant was under arrest.[2] 
During a post-arrest search of appellant’s car, Officer Smith discovered a
camouflage jacket; it is disputed whether Officer Smith recovered the jacket from
appellant’s back seat or by forcibly entering appellant’s locked trunk by
removing the back seat of appellant’s car.

When Officer Smith moved the jacket to look
underneath it, a small black bag fell out.  Inside the open black bag, Officer
Smith saw what he believed to be “crack rocks” inside a pill bottle and “crack
cookies” in a clear plastic bag.  Officer Smith testified that the substance in
the pill bottle and plastic bag field tested positive for cocaine, and that
such a “[large] amount” of crack cocaine more likely would be carried by a
seller rather than a user.  He also testified that he found no evidence of
crack cocaine use in appellant’s car.  Officer Smith met with Houston Police
Department K-9 Officer Richard Corrales after appellant’s car was towed, and
Officer Corrales’s narcotic detection dog alerted to the $901 in cash.    

Houston Police Department crime lab criminalist
specialist James Miller testified that he performed several laboratory tests on
the substance recovered from the jacket in appellant’s car, which he determined
to be 19.7 grams of crack cocaine.

Appellant filed a pre-trial pro se motion to suppress
the crack cocaine found in his car as the fruit of an illegal search.  The
trial court denied the motion.  Appellant re-urged the motion to suppress at
trial.  Appellant did not request and the trial court did not include an
instruction in the charge directing the jury to disregard evidence of the crack
cocaine if the jury believed, or had a reasonable doubt that “the evidence was
obtained in violation of [the laws or Constitution of Texas or the United
States].”  See Tex. Code. Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).

The jury returned a verdict of guilty.  After a trial
on punishment, the trial court sentenced appellant to imprisonment for 35 years
in accordance with the jury’s verdict, which was based on two enhancement
paragraphs.  Appellant timely appealed, arguing (1) his trial counsel was
ineffective; and (2) the trial court erred in failing to instruct the jury to
consider the legality of Officer Smith’s search.   

ANALYSIS

I.         Ineffective
Assistance of Counsel

Appellant argues in his first issue that his trial
counsel was ineffective for failing to obtain a ruling on the re-urged motion
to suppress the crack cocaine recovered from appellant’s car.

An ineffective assistance of counsel issue may be
raised for the first time on direct appeal, although the record on such a
direct appeal often will not be sufficient to show that counsel was
ineffective.  Cannon v. State, 252 S.W.3d 342, 347 n.6, 350 (Tex. Crim.
App. 2008).  In determining whether his trial counsel’s representation was
ineffective such that it violated appellant’s Sixth Amendment right to counsel,
we use the two-prong test laid out in Strickland v. Washington, 466 U.S.
668 (1984).  See Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App.
1999) (citing Strickland, 466 U.S. at 668).  To establish ineffective
assistance of counsel, a defendant must show that (1) his counsel’s performance
fell below an objective standard of reasonableness; and (2) but for counsel’s
unprofessional errors, the result of the proceeding would have been different. 
Id.    

The following exchange took place during Officer
Smith’s testimony offered by the State:

[COUNSEL FOR APPELLANT]: Your Honor, as part of the
reurging the motion to suppress, may I ask this be done outside the presence of
the jury?  I think [the State’s] about to get into what [Officer Smith] found
in the car.

                        *                                  *                                  *

(At the Bench)

THE COURT: Okay.  They are entitled to put on their case. 
If you have something else you want to ask him outside the presence of the jury
when [the State’s] through, we can do that.

[COUNSEL FOR APPELLANT]: Judge, he is about to go into what
he found in the car, particularly, the drugs, in which case once it is before
the jury, then it doesn’t do me any good.

THE COURT: If I grant your motion, they are done.  We are
in the middle it [sic].  Jeopardy attached, so.

[COUNSEL FOR APPELLANT]: Okay.

THE COURT: I am carrying it along with the trial.  That’s
what I’m trying to think through, whatever you want to put on.  If you have
something else you want to put on outside the presence of the jury, that’s
fine, but the —

[COUNSEL FOR APPELLANT]:
Okay.  That’s fine, Judge.  I understand.

The State presented its case in chief, and
appellant’s counsel presented testimony from appellant regarding the arrest and
search.  Appellant’s counsel then stated:

[COUNSEL FOR APPELLANT]:  Judge, I am assuming my motion to
suppress was denied?

THE COURT:  Yes, ma’am.[3]

This exchange belies
appellant’s contention on appeal that his counsel’s performance fell below an
objective standard for reasonableness because counsel failed to obtain a ruling
on the re-urged motion to suppress.  See Thompson, 9 S.W.3d at 812 (citing
Strickland, 466 U.S. at 668).[4]

We overrule appellant’s first issue.

II.        Article 38.23(a)
Instruction

Appellant argues in his second issue that the trial
court should have instructed the jury under article 38.23(a) of the Code of
Criminal Procedure, and that the failure to do so egregiously harmed
appellant.  See Tex. Code Crim. Proc. Ann. art. 38.23(a).    

Article 38.23(a) states:

No evidence obtained by an officer
or other person in violation of any provisions of the Constitution or laws of
the State of Texas, or the Constitution or laws of the United States of
America, shall be admitted in evidence against the accused on the trial of any
criminal case. 

In any case
where the legal evidence raises an issue hereunder, the jury shall be instructed
that if it believes, or has a reasonable doubt, that the evidence was obtained
in violation of the provisions of this Article, then and in such event, the
jury shall disregard any such evidence so obtained.

Id.  An article 38.23(a)
jury instruction must be given in any case in which the defense raises a
factual dispute about the legality of how the evidence was obtained; the
requirement for such an instruction does not depend on a request from the
defendant.  Pickens v. State, 165 S.W.3d 675, 680 (Tex. Crim. App.
2005).  However, when a defendant fails to request such an instruction, we
review the alleged error for egregious harm.  Roberts v. State, 321
S.W.3d 545, 553 (Tex. App.—Houston [14th Dist.] 2010, pet. ref’d) (citing Bluitt
v. State, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004), and Ortiz v. State,
144 S.W.3d 225, 231 (Tex. App.—Houston [14th Dist.] 2004, pet. ref’d)).

A defendant must meet three requirements before he is
entitled to a jury instruction under article 38.23(a): (1) the evidence heard
by the jury must raise an issue of fact; (2) the evidence on that fact must be
affirmatively contested; and (3) the contested factual issue must be material
to the lawfulness of the challenged conduct in obtaining the evidence.  Madden
v. State, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007).  

A.        Entitlement to an Instruction

Appellant argues: “In the present case such an issue
was in fact raised by the testimony of Appellant that the drugs were found in
the car, that the trunk was locked, and that he did not give permission to the
officer to search the trunk. . . .  Appellant’s testimony was further supported
by the evidence slip by the arresting officer to the police lab, which stated
that the drugs were found in the trunk.”

Officer Smith testified at trial that he found the
camouflage jacket containing the crack cocaine in the back seat of appellant’s
vehicle.  However, he indicated on the evidence submission form that the jacket
containing the crack cocaine was recovered from the vehicle’s trunk.  He
testified:

Q.  So can you tell us why this evidence submission form
[—] that you said you filled out truthfully [—] indicates that it was found in
the jacket in the trunk of the car?

A.  It was — it has been a while back, back on February 2nd
of ’09.  I filled it out.  Never was able to get into the trunk.  Asked Mr.
Pruitt how to get into the trunk and he said it wasn’t working.  

                        *                                  *                                  *          

Q.  But why — can you explain to us why the evidence
submission form would indicate that you found it in the jacket in the trunk of
the car?

A.  Probably just a mistake or
omission on my behalf.

Appellant testified that he was seated in the patrol
vehicle during the search with an unobstructed view of his car, which was
parked directly in front of the patrol vehicle.  He testified regarding the
search:

Q.  After [Officer Smith] searched the passenger — I mean,
the driver’s area, did he find anything or did he indicate to you that he had
found anything?

A.  No, ma’am.

                        *                                  *                                  *          

Q.  Okay.  After he searched the driver’s area [of your
car], where did he search?

A.  Backseat.

Q.  Did he ever search the front passenger side.

A.  Yeah.  He searched the whole front side first, then he
went to the back.

Q.  Okay.  What happened next?

A.  Approximately two more officers appeared at the scene.

Q.  Any idea who they were?

A.  They was Metro police officers too.

Q.  Okay.  And did he have — did Officer Smith have a
conversation with them?

A.  Yes, ma’am.

Q.  Did — what happened next?

A. Once he had a conversation — conversation with them, they
immediately start[ed] searching my car, also.

Q.  So at this time they had three officers searching your
car?

A.  Yes, ma’am.

                        *                                  *                                  *

Q.  Did you — what happened next after they searched the
backseat of the car and didn’t find anything?

A.  Well, the officer — all three officers repeated [sic]
search and search and search the passenger area of my car repeatedly, you know
what I’m saying, to no avail.

Q.  How long, if you can remember, were they searching your
car?

A.  They searched it for a good while, passenger only.

Q.  Okay.  Give me an idea of time.

A.  I say 30 minutes.

Q.  30 minutes of searching inside the car.  What happened
next?

A.  Well, they tried to get into the trunk.

Q.  And when you say they tried to, was there something
wrong with your trunk?

A.  No, it wasn’t nothing wrong with my trunk.

Q.  Okay.  So why couldn’t they get in it?

A.  I drive a 2005 Grand Prix, you know what I’m saying? 
Only two ways you can get in my trunk, by remote control or you can hold the
unlock switch button down.  At that time my remote control was broke.  I had
ordered a new — a new one was in order, so they couldn’t get in the trunk that
way.

Q.  So the remote wasn’t working.

A.  Yes.  I didn’t have it at all.  I had it on my
keychain.

Q.  And what is the other way to get in the trunk?

A.  You got to hold the unlock switch down on my car.  It
will pop open.

Q.  Did they do that?

A.  They didn’t have no knowledge of that.

Q.  Did they ever ask you about getting in the trunk?

A. They never asked me.  They only asked the wrecker driver
for assistance, you know what I’m saying?  They didn’t know how to open the
trunk and he asked — he told him, No.

Q.  Well if you had — if they asked you how to get in your
trunk, would you have told them?

A.  No.

Q.  And did they eventually get in the trunk?

A.  Yes, ma’am.

Q.  How did they get in the trunk?

A.  They tore — Officer Smith tore my backseat — my
backseat down and [got] in my trunk that way.

Q.  And did he find anything in the trunk?

A.  Yes, ma’am.

Q.  And what was found in the trunk?

A.  He found the jacket, you know what I’m saying, with the
— that had the drugs in it.

                        *                                  *                                  *

Q.  Now, you heard Officer Smith testify that the jacket
with the drugs was found in the backseat of the car.  Is that true?

A.  No, ma’am.

                        *                                  *                                  *

Q.  [Y]ou are saying that they
basically ripped your car apart looking for these drugs, correct?

A.  No, ma’am.  They just
ripped my backseat out.

The jury therefore heard affirmative and contested
evidence on the factual issue of whether the crack cocaine was discovered in
the back seat or in the trunk of appellant’s car.  See Madden, 242
S.W.3d at 510.  Appellant and the State disagree about whether the issue is
material and whether appellant therefore was entitled to an article 38.23(a) instruction. 
See id.  

The State argues that the dispute is immaterial
because even if Officer Smith found the crack cocaine in the manner described
by appellant, the trunk nonetheless was within the permissible scope of a
lawful post-arrest inventory search.  The State relies on Richards v. State,
150 S.W.3d 762 (Tex. App.—Houston [14th Dist.] 2004, pet. ref’d) (en banc), in
making this argument.  Richards held that the trial court did not err in
concluding that the police officer, who testified that he acted pursuant to his
training, lawfully accessed the locked trunk of the appellant’s vehicle with
the ignition key.  Id. at 771 (“The opening and inventory of
easily-accessible containers serves both to protect the owner’s property and to
insure against false claims.”).

Appellant did not testify that Officer Smith accessed
appellant’s trunk with a key, or that the trunk was readily accessible. 
Appellant testified that Officer Smith “tore [the] backseat — [the] backseat
down and [got] in [the] trunk that way,” and that “[t]hey just ripped my
backseat out.”  The circumstance described by appellant differs from “[t]he
opening and inventory of easily-accessible containers” discussed in Richards. 
See Gill v. State, 625 S.W.2d 307, 320 (Tex. Crim. App. 1980) (op. on
reh’g) (“Here, as the police officers had lawfully impounded the automobile,
they had the lawful right to perform ‘caretaking’ functions regarding it. 
However, under the facts presented, they did not have the lawful right to
forcibly enter the locked trunk of the automobile” by pulling the seat back so
the officers could inspect the trunk), overruled in part on other grounds by
Osban v. State, 726 S.W.2d 107, 108–10 (Tex. Crim. App. 1986), overruled
by Heitman v. State, 815 S.W.2d 681, 685 (Tex. Crim. App. 1991); cf.
Delgado v. State, 718 S.W.2d 718, 721–22 (Tex. Crim. App. 1986) (distinguishing
use of force in Gill from situation in which officer uses defendant’s
key to access and inventory locked trunk); Kelley v. State, 677 S.W.2d
34, 37 (Tex. Crim. App. 1984) (same); Stephen v. State, 677 S.W.2d 42,
44 (Tex. Crim. App. 1984) (same).

We assume without deciding that appellant was
entitled to an article 38.23(a) instruction under these circumstances, and that
a factual dispute regarding discovery of the crack cocaine in the back seat
versus discovery after forced entry into appellant’s locked truck by “ripp[ing]
the back seat out” is material to determining whether the search can be
justified as a lawful inventory search.  Even with these assumptions, reversal
is not warranted unless appellant was egregiously harmed by the trial court’s
failure to include an article 38.23(a) instruction.  See Roberts v. State,
321 S.W.3d at 553–54.  We now turn to that inquiry.

            B.        Egregious
Harm

Egregious harm is a difficult standard that must be
determined on a case-by-case basis.  Id. at 553 (citing Ellison v.
State, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002), and Green v. State,
233 S.W.3d 72, 78 (Tex. App.—Houston [14th Dist.] 2007, pet ref’d)).  Egregious
harm due to charge error exists if the error affects the very basis of the
case, deprives the accused of a valuable right, or vitally affects a defensive
theory.  Id. at 553–54 (citing Allen v. State, 253 S.W.3d 260,
264 (Tex. Crim. App. 2008)).  The error must have been so harmful as to
effectively deny the accused a fair and impartial trial.  Id. at 554.  

In determining whether appellant suffered egregious
harm, we consider (1) the entire jury charge; (2) the state of the evidence,
including the contested issues and weight of probative evidence; (3) arguments
made by counsel; and (4) any other relevant information revealed by the record
as a whole.  Oursbourn v. State, 288 S.W.3d 65, 69 (Tex. App.—Houston
[1st Dist.] 2009, no pet.) (citing Stuhler, 218 S.W.3d 706, 719 (Tex.
Crim. App. 2007)).  We place no burden of proof or persuasion to show egregious
harm on either appellant or the State.  Id. (citing Warner v. State,
245 S.W.3d 458, 464 (Tex. Crim. App. 2008)).  Before we can find egregious
harm, the record must show that appellant suffered actual, rather than merely
theoretical harm from the jury charge error.  Id. (citing Almanza v.
State, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984)).  We determine whether
appellant suffered egregious harm by analyzing the impact of the jury
instruction, not by analyzing the impact of the admission of the challenged
evidence.  See id. (citing Ellison, 86 S.W.3d 226, 228 (Tex.
Crim. App. 2002)).

With respect to the jury charge, the jury was
instructed on the offense as set forth in the indictment.  In a possession with
intent to deliver case, the State must prove that the accused (1) exercised
care, custody, control, or management over a controlled substance; (2) intended
to deliver the controlled substance to another; and (3) knew that the substance
in his possession was a controlled substance.  See Tex. Health &
Safety Code Ann. §§ 481.002(38), 481.112(a), (d) (Vernon 2009); see also
Parker v. State, 192 S.W.3d 801, 805 (Tex. App.—Houston [1st Dist.] 2006,
pet. ref’d).  The charge explained the requirements of the offense in
conformity with these elements, and included appropriate definitions that are
not challenged on appeal.  

No portion of the charge addressed whether the jury
could consider or disregard evidence based upon whether that evidence was
lawfully obtained.  “Here, the error was the omission of an instruction, rather
than the presentation to the jury of an erroneous instruction.”  Taylor v.
State, 332 S.W.3d 483, 493 (Tex. Crim. App. 2011).  Therefore, this is not
a circumstance in which the jury is presumed to have followed — and been led astray
by — an instruction in the charge that affirmatively misstated the law.  Compare
id. at 493 (omission of instruction limiting jury’s consideration to events
occurring after appellant’s seventeenth birthday did not result in egregious
harm), with Hutch v. State, 922 S.W.2d 166, 172, 174 (Tex. Crim.
App. 1996) (egregious harm resulted from inclusion of erroneous jury
instruction that “was 180 degrees opposite of what it should have been”).

Turning to the state of the evidence, appellant
argues as follows on appeal:  “Without the admission of the drugs there would
have been no case against Appellant, as the trial court stated on the record.” 
This argument does not account for all of the evidence introduced at trial — in
particular, extensive evidence pertaining to possession and intent that was proffered
by the appellant himself after the trial court made the observation paraphrased
in appellant’s brief.  Appellant did not argue at trial or in his appellate
brief that his extensive testimony regarding cocaine in his possession was
impelled by the State’s introduction of evidence obtained in violation of the
law, and we cannot speculate as to whether appellant would have testified under
different circumstances.  See Davis v. State, 203 S.W.3d 845, 855 (Tex.
Crim. App. 2006).  Appellant testified as follows on direct examination:

A.  So when I get in the house, my — everything is full, so
I get in the house.  I drop everything, had planned to go back and get my coat
out of the trunk, but my phone ring [sic].  When I heard the phone ring, a
customer calling me, you know what I am saying, wanting some drugs.  I let him
know I was out because I am through, you know what I’m saying.

*                                  *                                  *

A.  Basically, I agree that that’s my dope.  I am not — I
take full responsibility.  Only thing I am saying, I did not knowingly and
intentionally possess that dope for the simple fact I honestly forgot the dope
was in the trunk.

      I don’t — I had every intention when I went home to
retrieve my dope from the trunk and put it in my house.  For the simple fact I
got into a little argument/fight with my girlfriend about going back out to the
club, I got sidetracked you know what I’m saying.

*                                  *                                  *

A.  I just took a wash-up and
I just forgot to go back and get the dope out of the trunk.

The following day,
appellant’s counsel informed the court that appellant had presented her with a
list of 20 or so additional questions he wanted her to ask him in front of the
jury.  Appellant’s counsel stated at a hearing outside the jury’s presence, “I
do not feel, as his attorney, that it is in his best interest that I bring this
information before the jury,” and asked to make a record establishing that
appellant insisted upon having the questions asked.  The trial court complied
with counsel’s request, and appellant confirmed on the record his desire to
have the questions asked.

Following this confirmation, appellant’s counsel
asked the questions while the jury was present.  Appellant testified on
redirect as follows. 

Q.  Okay.  Sir, can you tell me the difference between
blow-up dope and straight dope?

A.  Well, the difference between blow-up and straight dope,
straight dope is basically baking soda and cocaine mix.  It is really a —
basically a pure form of cocaine.  Blow-up dope, for instance, you have — take
28 grams make an ounce.  To make an ounce of blow-up dope, I require 14 grams,
which would stretch out the dope.  I give them more dope, but the quality of
the dope will be like trash.

*                                  *                                  *

A.  The value of the dope that I was arrested with, it was
approximately $1500, but what I paid for the dope was approximately $500.  It
was blow-up dope.  And —

Q.  Okay.

A.  And the different [sic] with blow-up dope, when you
cook it, it is wet.  Straight dope, when you cook straight dope, you know what
I’m saying, it dries faster.  And blow-up dope, also, even after you cook it,
it will still be wet, it doesn’t dry fast, but still be wet and it shrinks.

*                                  *                                  *

A.  What made me start selling drugs?  They come up in the
ghetto, small, mother needed things.  Man in that house seeing cousin, other
family do it, thought it was what is best to do, you know what I am saying, in
order to survive.

*                                  *                                  *

Q.  Do you enjoy selling drugs?

A.  No, ma’am.

Appellant’s additional
testimony constitutes evidence that appellant (1) sold drugs and received
communications from his customers; and (2) was arrested with $1500 worth of
“blow-up dope.”  Officer Corrales testified that one gram of crack cocaine
sells for approximately $100.

Appellant’s testimony provided an ample and
compelling basis for the jury to conclude that appellant exercised care,
custody, control or management over at least 15 grams of crack cocaine,
including any adulterants and dilutants, which he intended to deliver to
another with knowledge that the crack cocaine was a controlled substance.  This
basis would exist on this record even if the jury had (1) been instructed under
article 38.23(a); and (2) disregarded the crack cocaine found in appellant’s
car.

The State also introduced Officer Corrales’s
testimony that his K-9 narcotic detection dog alerted to appellant’s $901 in
cash.  Officer Corrales testified that his narcotic detection dog is certified
to alert at four different narcotic odors — marijuana, cocaine, heroin, and
methamphetamines.  He explained that he cannot know which narcotic triggers the
alert or how the narcotic came into contact with the currency.  He testified
that the length of time narcotics odor would stay on cash would vary depending
on whether someone carrying the currency is frequently in contact with
narcotics or sharing an environment with narcotics.  

Officer Corrales testified that it would be “almost
unbelievable” for an individual to possess approximately 19 grams of crack
cocaine for personal use rather than for sale.  Officer Smith similarly
testified that the amount of cocaine possessed by appellant was probably for
sale.  From this evidence, the jury could have concluded that appellant
possessed the crack cocaine with the intent to deliver it.  

During closing argument, the State relied heavily and
repeatedly upon appellant’s admissions during his testimony.  The State
highlighted appellant’s testimony in reference to each element of the offense. 
Appellant’s counsel emphasized appellant’s contention that he did not act
knowingly because he had forgotten about the drugs in the trunk of his car and
had forgotten to take them out before leaving to go out for the evening.  In
rebuttal, the State again emphasized appellant’s testimony and stated, “[H]e
told you not only did he buy that crack or cocaine to be able to make those
crack cookies to sell on the street, but he intentionally put them in his
car.”  The State continued, “He intentionally went out on the streets with
the[m].  He knew that he was engaging in conduct that could lead to crack being
in his vehicle.”

  Given this record, we cannot say that the omission
of the article 38.23(a) instruction caused egregious harm.  This is particularly
so in light of testimony that appellant insisted upon giving against the advice
of counsel.  See Taylor, 332 S.W.3d at 493 (“[T]he jury in this
case could have convicted Appellant based upon evidence presented, even if the
proper instruction had been given . . . .”); Cummings v. State, No.
14-10-00107-CR, 2011 WL 1045448, at *3 & n.2 (Tex. App.—Houston [14th Dist.]
March 24, 2011, no pet. h.) (omission of article 38.23(a) instruction was not
error; “[e]ven if the trial court had erred, we would conclude that appellant
did not suffer egregious harm.”); cf. Hutch, 922 S.W.2d at 172
(“[W]e must presume the jury followed the erroneous instruction which
authorized the stop if appellant was wearing a seat belt.  In fact . . .
such a stop would have been illegal.  Under the erroneous instruction,
the only way the jury could have convicted was by using illegally obtained
evidence.”) (original emphasis). 

We overrule appellant’s second issue.

CONCLUSION

Having overruled appellant’s two issues on appeal, we
affirm the judgment of the trial court.

                                                                                    

                                                                        /s/        William
J. Boyce

                                                                                    Justice

 

 

Panel consists of Justices Brown,
Boyce, and Jamison.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1]
Appellant testified that he was not intoxicated, but does not challenge the
lawfulness of his arrest on appeal.





[2]
Appellant testified that his car was stopped at the traffic light, not in the
middle of the intersection.





[3]
This constituted a timely objection and ruling on the admissibility of the challenged
evidence subject to the motion to suppress under these circumstances.  See
Garza v. State, 126 S.W.3d 79, 84–85 (Tex. Crim. App. 2004) (error
preserved because trial court carried motion to suppress with trial, and trial
court stated that it would hear the evidence as it was presented to the jury
and that the State would be subject to directed verdict if the trial court
granted motion at the end of the relevant testimony).





[4]
Appellant does not argue on appeal that the trial court erred in denying the
pre-trial or re-urged motions to suppress.